ASSOCIATED INVESTMENT CORPORATION, Plaintiff-Appellant, v. LAIDLAW WASTE SYSTEMS, INC., Defendant-Appellee.
Second District   No. 2—85—1002

Opinion filed February 3, 1987.

Fernando L. Engelsma, of Alexander & Cicero, P.C., of Rockford, for appellant.

Curtis R. Tobin II, of Johnson, Tobin & Ramon, of Belvidere, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Associated Investment Corporation, brought an action against defendant, Laidlaw Waste Systems, Inc., alleging that defendant had breached a lease agreement by vacating the premises prior to the expiration of the lease without good cause and that defendant owed plaintiff certain monies that were due under the lease for insurance premiums, prorated real estate taxes and cost-of-living expenses. Plaintiff also sought a money judgment against defendant for damages to the leasehold and for defendant's failure to insure plaintiff's equipment and personal property which had remained on a portion of the leased premises. Following a bench trial, the trial court entered judgment for plaintiff and against defendant in the amounts of $47,228.50 as and for rent due under the lease, $6,045 as and for damages to the leasehold, and the sums of $10,605 and $5,953 for insurance premiums paid by plaintiff due to defendant's failure to provide proof of insurance, for a total of $69,831.50, together with 9% interest since June 1, 1984, the date as of which the trial court found the defendant had vacated the premises. Plaintiff appeals, contending that the award of damages was inadequate.

On December 1, 1975, Theta Systems, Inc., a predecessor company of defendant, entered into an agreement with Ernest Tice to lease the premises at 1208 Milford Avenue, Rockford. Sometime thereafter, plaintiff acquired the property following a foreclosure action and became defendant's landlord.

On or about December 14, 1981, plaintiff and defendant entered into a three-year extension of the lease, referred to as option II. Option II contained the following terms:

"The Current lease will be extended for three years, with the option for two additional years, including six additional bays. The initial monthly rental rate will be Fifty-five Hundred Dollars ($5,500.00) payable in advance. Annual increases to be effective January 1st of each year, based on the increased percentage of the Consumer Price Index. The Lessee's Real Estate Tax obligation to be that amount of tax over the base year. The Base Year to be changed to 1979 taxes paid in 1980. All other terms and conditions to remain the same [sic] This letter shall be attached to, and become a part of the above mentioned lease.

Lessee has the option to purchase said property effective September 1, 1983 and extending for the term of the lease. Purchase price of the front building for $350,000.00 and all the property, including both buildings for $500,000.00 Owner will finance at 17.5%. Monthly payments not to exceed $7,500.00 with principle [sic] payments every other year.

Lessee to provide insurance coverage on said premises-naming lessor and any other parties of interest in the following amounts: Public Liability $1,000,000., Property Damage $500,000., Building and Content $500,000."

Sometime in May 1984, defendant vacated the premises without notice to plaintiff.

In a one-count complaint, filed July 2, 1984, plaintiff alleged that defendant had failed to pay the rent due for June 1984 and plaintiff was of the opinion that defendant would not make the rest of the rental payments due for the balance of 1984, payable at the rate of $6,045 per month; that defendant, in violation of the lease and State law had left the premises in a total state of disrepair and damaged in excess of $15,000; that defendant had taken, or allowed to be taken while it was in possession of the premises, certain equipment and personal property belonging to the plaintiff and its associated companies worth in excess of $15,000; that defendant had failed to return the premises to its original condition; and that as a result of the damage and missing property, plaintiff suffered a loss in excess of $15,000. The complaint also sought statutory interest on the rental payments, plus attorney fees and costs.

The bench trial commenced on September 9, 1985. The first witness was John Dunker, president of plaintiff as well as of JFD Corporation, a leasing company that handles business equipment and supplies leasing to other companies, and D & B Contractors, Inc., a construction company. He testified that he acquired the property at 1208 Milford from Thorp Finance and that they had told him what was included in the property addition to the building. He personally observed an air conditioner, some tanks, and an overhead crane.

Dunker testified that he negotiated the three-year extension of the lease, as well as the option II provisions with Bernie Kiley, chairman of defendant. The lease provided for insurance for the contents, because according to plaintiff's insurance company, plaintiff could not carry insurance on the contents since plaintiff did not have control of the building. Plaintiff did carry liability and casualty insurance because it was required by its lender. Although defendant was to carry the liability insurance, plaintiff never removed its liabil-

ity insurance, plaintiff never removed its liability coverage since defendant never provided plaintiff with a copy of the insurance policy. The first indication that defendant had moved out occurred when the June 1984 rent was not paid. Kiley was contacted, and he indicated that they were vacating the premises. Dunker described the premises as full of debris, the place was unlocked, and doors and windows were missing. Much of the place had been ransacked, and much equipment was missing. Pictures were taken of the premises. Dunker compiled a list over several days of what equipment and property was missing. The list was marked plaintiff's exhibit 19 and admitted into evidence later on. The list consisted of the type and quantity of equipment, the unit price, and the total. The unit price was based upon Dunker's prior experience in the construction business and represented the best price for which the item could be acquired. The total for all of the missing equipment was $740,601.40. According to Dunker, the equipment was worth more used than new. He estimated the fair market value of the equipment to be between 50% and 70% of the total stated above.

On cross-examination, Dunker testified that he did not recall what, if any, documents he used to complete the equipment list; that he had just recalled what equipment had been there and what was there after defendant vacated the premises. He did not recall which of his companies owned the various pieces of equipment. He obtained the unit cost figures by talking to various vendors from whom he would obtain similar equipment and from trade journals.

Thomas Stulte testified for plaintiff. He had been employed by Theta Systems, Inc., and later, defendant, from January 1976 to December 1981 at the Milford Avenue plant. During the period of his employment, he observed some construction equipment in the back building. He testified that there was damage done to the buildings and that a crane with an electric hoist had disappeared. On cross-examination, he stated that at the time the hoist disappeared, Tice still owned the property.

Harold Bauling testified for the plaintiff. He had been in the construction business since October 1958 and had been self-employed since 1979. He conducts appraisals, as well as doing repair work. He had done half a dozen appraisals and repaired more buildings. He was contacted in June 1984 to do an appraisal of 1208 Milford Avenue. He did the appraisal by making six to eight visits to the property and by contacting other contractors. He prepared a written appraisal, which was admitted as plaintiff's exhibit No. 24. According to the written appraisal, the total cost to repair was $225,753.

On cross-examination, Bauling testified that Dunker had gone over with him the items that needed repair. He did not have any information with him as to how he compiled the estimates to fix the guard posts and garage doors. He indicated that as to the item of $40,480 to remove and replace siding, doorposts, and valley gutters, he did not recall how that cost was broken down or allocated. He did not recall anything about his estimate of $57,000 for a crane other than that it was a 10-ton overhead crane. He had no notes to indicate how he arrived at $23,500 for flooring, tile, and ceiling tile. He did not recall in bidding on the heaters, how many there were or what their condition was.

Ernest Tice testified for defendant. He had owned the property at 1208 Milford and had leased it to Theta, defendant's predecessor, in January 1976. He subsequently lost the property in a foreclosure proceeding. The crane on the premises belonged to him, and it was removed prior to the foreclosure proceedings. He also indicated that other personal property, including power wiring and an air compressor and welder, was also his and that these had been sold to defendant. He had remained on the premises as an employee of Theta and then of defendant for some 14 months following the inception of the original lease. At the time he rented the premises to Theta, the buildings were intact and "decent." He noted that one of the areas which plaintiff alleged was damaged was actually damaged by a Theta truck while Tice was still the landlord. He had inspected the premises just prior to his testifying. He observed some "dings" in the back portion of the building which Tice attributed to ordinary wear and tear.

Merrill Butler testified on behalf of defendant. He has been a professional engineer for 36 years and a general contractor for 44 years. He has from time to time been called upon to estimate costs of building construction and repairs. He had been requested to make an inspection of the premises at 1208 Milford. He and Willard Davidson, defendant's appraiser, made a personal inspection of the premises. He prepared a written list of the items which needed repair or replacement together with the costs of accomplishing the repair or replacement.

On cross-examination Butler testified that the items on the list were those pointed out to him by Davidson as needing repair.

Willard Davidson testified for defendant. He has been a real estate appraiser for 39 years. He has taught real estate appraising and given courses for the Society of Real Estate Appraisers. He is also a member of the Society of Real Estate Appraisers and the

S.R.A. designation. He is also a licensed real estate broker. At the request of defendant's attorney, he visited the Milford property on several occasions and made a fair market value appraisal of the property. He explained that there are three approaches to determine market value: the cost approach, which is the replacement cost minus any depreciation to which is added the value of the land; the income approach, wherein income that the property is earning is calculated and expenses are deducted to arrive at a net income, which is capitalized into a value estimate; and the market approach, wherein comparisons are made between sale properties and the subject property and a value is determined. Davidson determined that the cost and income approaches were valid and appropriate for valuing the Milford property. Using the cost approach, he valued the property at $168,000 and at $156,000 using the income approach. In making his final determination, he used the income approach because he had a better basis for the rental on the income approach than he did for the cost figure due to the difficulty in determining depreciation.

Earl Mosher testified on behalf of defendant. He was presently employed by defendant and had worked for defendant as a foreman at the Milford plant between 1980 and 1984. His duties included directing the work of the mechanics; he was responsible for the parking garages and also for the personal property Dunker had left in the back building. He testified that he was very familiar with items of personal property property Dunker had stored on the premises. He normally did a walk-through inspection of the area to familiarize himself with what was there. He recalled that originally Dunker had moved all of the property to the west side of the building. Sometime later, plaintiff moved out half of the items to another storage facility. Anything left was practically junk. At the time defendant vacated the premises, Mosher made a physical inspection to make sure nothing had happened the night before or the morning they left. All of the plaintiff's property was still there. Mosher locked all the doors before leaving.

Mosher reviewed plaintiff's list of missing equipment. He stated that he had never seen most of the items on the list and stated further that they were not in the building at the time defendant vacated the premises. He also testified that the burglar alarm was in operation on the date defendant vacated the premises, and that while at the Milford plant, he installed a crane with a chain hoist for defendant, which was removed when defendant vacated the premises. No damage to property occurred when the crane was re-

moved.

Michael Patitucci testified on behalf of the defendant. He is the regional vice-president of defendant. He visited the Milford plant between 30 and 50 times per year while it was in existence. He indicated that the trucks would frequently hit a door or side post, and defendant always repaired the damage. Defendant also made improvements to the property. He did not object to paying the balance due on the lease.

On cross-examination, Patitucci did not recall being billed for insurance in the amount of $5,943. He stated that defendant had insured the premises but had never provided proof to Dunker. He denied that defendant was responsible for insuring Dunker's contents and had never received a list of such property. Although he was aware that plaintiff was making claims for missing equipment and damage to the premises, these claims were not turned over to the insurance company since it was felt that there was nothing to substantiate the claims.

Patitucci also testified that on the option II lease, there was an option to purchase the property for a total of $500,000. According to the witness, at one point defendant had considered buying the property, but the $500,000 figure was Dunker's. He was not involved in the negotiations between Dunker and Kiley to purchase the property for $400,000.

Richard Lutzow testified on behalf of the defendant. He has been the general manager of the Rockford operation of defendant since 1979. He testified as to improvements that defendant had made to the property. He also acknowledged that some damage had been done to the premises. Lutzow reviewed a number of invoices indicating many repairs bought and paid for by defendant, including the cost of a crane and structural steel purchased by defendant. Lutzow also indicated in reviewing plaintiff's photographic exhibits of the property that they depicted damage that was not there at the time defendant vacated the premises. He also corroborated the testimony of Mosher that the crane in question was paid for and installed by defendant and remained defendant's property when the lease was terminated.

Lutzow stated that he was also in the back building frequently and had knowledge of the personal property allegedly belonging to plaintiff in the back building. He reviewed plaintiff's list of missing equipment and indicated that he had never seen the property therein described located on the premises. All he saw were things he would describe as junk.

Lutzow testified that Dunker was on the premises frequently and never objected either to the condition of the premises inside or out or to any improvements or alterations made by the defendant.

On recross-examination, he testified that he was at a deposition on October 26, 1984, and at that time, stated that he did not know if he saw the items or not.

On rebuttal, John Dunker testified that during the period of the lease, he moved equipment in and out of the building because he was in the leased-equipment business at the time. He testified that the content insurance mentioned in the lease was to insure his contents, not those of defendant. He indicated this was so because the first lease did not provide for content insurance because defendant had not rented the rear building, and Dunker could still insure the contents there.

The trial court found little dispute that defendant owed $47,228.50 for the rent, cost-of-living increases, and taxes. The trial court also found that based upon the evidence, there was $6,045 in damages to the premises and that the insurance premiums of $10,605 and $5,953 were the obligation of the defendant. However, the trial court declined to enter a judgment for the loss of equipment, stating as follows:

"The reason I do not enter an additional Judgment for the personal property alleged by the plaintiff to be in the back building is because I cannot ascertain what the loss was—if I do ascertain what the loss was, I will tell you why I cannot, because Mr. Dunker himself had sat down, and he tried to remember out of his mind what was in that building. I think if he had had some list he presented in court, some inventory, something other than, 'It was this there, that there,' the Court would have something to hang its hat on. But he could not, and he did not.

Now, in my opinion, there is a gray area about whether or not the defendants were to insure, insure particular parts, particular pieces of personal property in that back building. Now, Mr. Dunker says, 'Of course, they were, because I couldn't get any insurance on it because they had the whole building. I had two of the bays or whatever, some of the bays back there.' My point being, Mr. Engelsma [plaintiff's attorney]—and you tried your darnedest to prove it for your client—that the personal property back there was of a certain value, and there were certain pieces of property, items of personal property back there. And it was the duty to insure the

lessee. Laidlaw was to insure the pieces of property back there.

I cannot so find from the evidence here. I cannot find that they have a duty to insure pieces of property that are never inventoried.

I have listened to Mr. Dunker say, 'I could not insure it because it wasn't mine. The building wasn't mine. That is, I leased it out, so it was up to them to do it, and they said they would do it.'

That is not enough. That is not enough, in my opinion. I do not think Mr. Dunker has proven that or Associated, the plaintiff here, has proven that part of the lawsuit, or I would award damages for that particular loss of personal property."

The trial court entered judgment in the amount of $69,831.50 plus interest at 9% from June 1, 1984, and costs of suit. This appeal followed.

Plaintiff contends, first, that the trial court's award of $6,045 for the damage to the leasehold is inadequate, and that the trial court should have found the damage to the leasehold to be $225,000.

■ The measure of damages to real estate is the difference in value immediately before and after the occurrence. (*Central National Bank & Trust Co. v. Central Illinois Light Co.* (1965), 65 Ill. App. 2d 287, 290.) Plaintiff relies on the February 26, 1982, letter (plaintiff's exhibit No. 27) from defendant's chairman, Bernie Kiley, to plaintiff's president, John Dunker, which contained, *inter alia,* terms of an option to purchase the Milford property for $400,000, as evidence of the value of the property. Plaintiff cites *Jefferson Park District v. Sowinski* (1929), 336 Ill. 390, for the proposition that evidence of offers to purchase for cash by persons able to buy the property are admissible as some evidence of what the property would sell for. Plaintiff concludes that since $400,000 minus the $150,000 value placed on the property by defendant's appraiser, Davidson, equals $250,000, a figure very close to the amount that Bauling, plaintiff's expert, calculated it would cost to restore the property, the difference in value cannot be explained as mere depreciation, but must be attributed to the damage done to the leasehold by the defendant. This assumes two things: that the $400,000 was accepted by the trial court as the value of the property prior to the damage inflicted by the defendant and that the trial court accepted Bauling's testimony as to the cost of repair or replacement.

The letter between Kiley and Dunker stated that it was confirming certain terms for the lease which had been discussed over the

telephone. It was impossible from the letter to tell who proposed the $400,000 for the option to purchase the property, nor was there any testimony as to who proposed that figure. In fact, the option in the lease required $500,000 to purchase the entire premises. Michael Patitucci testified that the $500,000 figure was Dunker's. Further, it was an option with owner financing available, not a cash offer, and there was no proof that defendant was capable of buying the property.

Plaintiff introduced no other testimony as to the value of the property. However, defendant's appraiser testified as to the various approaches to valuing the property and as to how he concluded the property was worth $156,000. After subtracting out the cost to repair, as determined by defendant's expert, Butler, he concluded that the fair market value of the property was $150,000.

The estimates of the cost to repair the damage to the premises presented by the plaintiff and defendant were vastly different. Plaintiff's expert, Harold Bauling, who had done six appraisals of costs to repair, testified that it would cost $226,000 to put the premises in good condition. He had visited the premises quite a few times and had compiled a list of what needed replacement or repair and the cost. However, defendant's witnesses disputed the ownership of some of the items that Bauling listed as missing and in need of replacement, such as the overhead crane for $57,000. On some of the other items, he was unsure as to how he had arrived at the costs. He also could not recall how certain costs were allocated.

In addition, plaintiff presented virtually no testimony on the condition of the premises when it took over from Tice. On the other hand, Tice testified for defendant that some of the damage existed at the time he was still the landlord. There was also testimony that Dunker visited the premises infrequently, and when he did visit, he never remarked about the damage to the premises.

Defendant's expert, Merrill Butler, had 36 years' experience as a professional engineer and 44 years' as a general contractor. Butler visited the premises once, with Willard Davidson, defendant's appraiser. Butler gave a detailed "work up" of the "cost to cure" and testified that his firm could complete the items listed for $6,045.

■■ ■ Credibility of witnesses is a matter for the trial court to determine, and a court of review will not disturb its findings when the evidence is contradictory unless they are against the manifest weight of the evidence. (*Orchard Shopping Center, Inc. v. Campo* (1985), 138 Ill. App. 3d 656, 665.) There was sufficient evidence from which the trial court could conclude that the damage to the

premises was $6,045 as opposed to $226,000, and we conclude, therefore, that the trial court's assessment of damage to the leasehold is not against the manifest weight of the evidence.

■ Next, plaintiff contends that the trial court erred when it declined to find that there was a contractual duty on the part of defendant to provide insurance for plaintiff's personal property stored on the subject premises. Plaintiff contends that the trial court did not award damages for the failure to insure, not because plaintiff failed to prove up the loss, but rather because the trial court felt that there should have been an inventory taken of plaintiff's property in order to obtain the insurance on it and that the obtaining of the inventory was a condition precedent to defendant's duty to insure under the lease. Since no evidence was introduced that plaintiff had to provide such an inventory, nor did the lease so provide, the plaintiff argues that the trial court's decision is against the manifest weight of the evidence.

Defendant contends that plaintiff's complaint did not allege defendant's breach of the provision requiring the providing of content insurance or seek damages as a result. Plaintiff did, in fact, file a motion to amend the pleadings and added a second count alleging a breach of the lease by defendant's failure to maintain content insurance. Defendant filed a motion to dismiss the amendment. It appears from the record that neither motion was ruled upon. However, from the record also, it appears that the trial court treated the issue as being raised though no damages were awarded.

Section 2—616(c) of the Code of Civil Procedure permits amendments of pleadings to conform to the proof presented at trial. (Ill. Rev. Stat. 1985, ch. 110, par. 2—616(c).) However, in *Gray v. City of Plano* (1986), 141 Ill. App. 3d 575, this court, quoting from *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 165, stated:

" 'Once a trial has begun *** an amendment should not ordinarily be permitted to set up matters of which the pleader had full knowledge at the time of interposing the original pleading and no excuse is presented for not putting its substance in the original pleading. [Citations.] This is particularly true where the amendment is prejudicial or would alter the nature and quality of proof required to defend.' " 141 Ill. App. 3d 575, 582.

■ A party may not prevail where the proof does not follow the allegations made therein. " '[T]o have evidence without pleading an issue is as fatal as pleading an issue and not supporting it with evidence.' " *Ambroiggio v. Board of Education of School District No.*

44 (1981), 101 Ill. App. 3d 187, 190, quoting *In re Walton* (1979), 79 Ill. App. 3d 485, 487-88.

Based upon the above, the issue of damages for defendant's failure to maintain content insurance for plaintiff was never before the court, and it was not error then for the trial court to make no damage award for the missing property.

■■ Assuming *arguendo*, that the issue of the content insurance had been properly raised by the pleadings, we agree with the trial court that there was insufficient evidence to prove the existence, let alone the disappearance, of $740,000 worth of equipment. Mr. Dunker, plaintiff's president, testified that he sat down over a couple of days to compile a list of what was there. Defendant offered testimony that Dunker was seldom on the premises. Several of defendant's witnesses testified that they were very familiar with plaintiff's property that was stored on the premises and that the vast majority of the items had been removed by the plaintiff.

It is apparent from the trial court's statement quoted above that, quite apart from the failure to inventory the property, plaintiff was also not entitled to a judgment for the alleged missing property because the evidence was insufficient to establish that the property had ever been there or what had happened to it. Where conflicting interpretations may be drawn from the evidence, a court of review will not disturb the decision of a trial court unless it is against the manifest weight of the evidence. See *Finnan v. Johnson* (1983), 111 Ill. App. 3d 479, 483.

■■ Finally, plaintiff contends that the testimony of defendant's own witnesses established that defendant had a duty to maintain plaintiff's personal property. However, plaintiff cites no authority for this argument in violation of Supreme Court Rule 341(e)(7). (103 Ill. 2d R. 341(e)(7).) Therefore, the point is waived. See *Flynn v. Vancil* (1968), 41 Ill. 2d 236.

For all of the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG, P.J., and INGLIS, J., concur.