Ronald W. KAFKA, doing business as K & R Realty, Plaintiff–Appellant,

v.

TRUCK INSURANCE EXCHANGE, a California Corporation, Defendant–Appellee.

No. 93–1580.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 30, 1993.

Decided March 23, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied April 21, 1994.*

---

* The Honorable Ilana Diamond Rovner took no part in the decision.

**384**

Leonard A. Nelson, Paul W. Gabler, Schoenberg, Fisher & Newman, Chicago, IL, Chester L. Blair, Blair & Cole, Chicago, IL, David A. Kaufman, Kaufman & Associates, Morton Grove, IL, Phyllis Russell (argued), Blair & Cole, Chicago, IL, for plaintiff-appellant.

William J. Sneckenberg (argued), Benjamin E. Alba, Sneckenberg & Associates, Chicago, IL, for defendant-appellee.

Before ESCHBACH, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Ronald W. Kafka, doing business as K & R Realty, purchased a two-and-one-half story commercial building located in Lyons, Illinois in November 1989. He subsequently purchased casualty insurance for the building from Truck Insurance Exchange ("TIE"). The policy limits were $150,000 for building damage plus the reasonable cost of removing debris. In February 1990, the building was severely damaged by fire.

Thereafter, Kafka filed a claim under the policy by submitting a proof of loss form. He claimed damage to the building in the amount of $150,000,[1] plus $3,600 for removal of fire debris. With Kafka's written consent, TIE conducted an investigation into the origin of the fire. As part of the investigation, TIE's attorney, William Sneckenberg, questioned Kafka under oath. During the course of the examination, Kafka refused to answer several of Sneckenberg's questions. For instance, Kafka refused to state whether he and his wife resided at 171 North Wood Road in Riverside, Illinois at the time of the fire and refused to provide his social security number and the names of his brothers. He also failed to bring certain tax returns,[2] bank statements, loan documents, and financial statements to the examination, as TIE had requested.

As the result of the investigation, Robert Jaske, TIE's branch claims manager wrote Kafka a letter, stating that Kafka's claim was being denied because of his "repeated failure to provide testimony and documents" necessary for TIE to complete its investigation and because he made material misrepresentations in his insurance policy application, in his proof of loss form, and during his examination under oath.

Kafka then filed the present action in the district court alleging that TIE wrongfully denied his insurance claim. In its answer to Kafka's amended complaint, TIE raised five affirmative defenses. It asserted that Kafka (1) intentionally set fire to the building, (2) made material misrepresentations under oath, (3) refused to answer questions and provide documents which were relevant to TIE's investigation of the fire, (4) knowingly

---

1. Due to an error, the original proof of loss form incorrectly stated that the loss was $15,000 rather than $150,000.

2. Kafka provided his tax returns to TIE after this suit was filed.

allowed the building to remain vacant beyond a period of 60 consecutive days, and (5) knowingly allowed the hazard to be increased without notifying TIE. Each defense, if proven, is a legitimate basis for TIE to deny coverage under the terms of the policy.

After a four day trial, the jury rendered a general verdict in favor of TIE. Additionally, the jury answered "yes" to four special interrogatories. The interrogatories were as follows:

> 1. Did Ronald Kafka intentionally set fire to his building or intentionally allow it to occur with knowledge and consent?
> 2. Did Ronald Kafka falsely swear to a material fact with an intent to deceive the defendant as to the cause of the fire or other facts material to the claim for insurance?
> 3. Did Ronald Kafka knowingly allow his building to remain vacant, as defined in these instructions, in excess of 60 consecutive days?
> 4. Did Ronald Kafka refuse to cooperate with the defendant on matters that were material to its investigation of the claim?

Kafka filed a post trial motion for a new trial raising essentially the same arguments that he makes in this court. The district court denied Kafka's motion. Kafka now appeals the district court's denial of his new trial motion.

### Discussion

"Because 'the authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court,' the grant or denial of a motion for a new trial 'is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion.'" *General Foam Fabricators v. Tenneco Chem.,* 695 F.2d 281, 288 (7th Cir.1982) (citations omitted). With this standard in mind, we

proceed to decide the issues raised in this appeal.

### Attorney–Witness

Kafka argues that Sneckenberg, TIE's trial counsel, was improperly allowed to act as both an advocate and a witness during the trial. Kafka contends that Sneckenberg used knowledge gained from his previous participation in the claim investigation to "testify" that Kafka refused to answer questions and provide documents relevant to the investigation. By interjecting his own personal knowledge into the trial, Kafka argues that Sneckenberg improperly assumed both the role of advocate and witness. Whether or not Kafka cooperated or made misrepresentations during the claim investigation was disputed by the parties and was the basis of one of TIE's affirmative defenses.

Kafka concedes that he did not object to any of Sneckenberg's questions or statements which he now claims constitute testimony as a witness. However, he urged the district court and now urges us to find "plain error."

▪ In civil cases,[3] we have uniformly refused to allow a remedy under the "plain error doctrine." *See Deppe v. Tripp,* 863 F.2d 1356, 1360–1365 (7th Cir.1988); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1295 (7th Cir.1987); *Kendra Oil & Gas, Inc. v. Homco, Ltd.,* 879 F.2d 240, 242 (7th Cir.1989). We refuse to do so here as well.

Kafka seeks application of the "plain error doctrine" because he alleges the district court permitted Sneckenberg to "testify" during his closing argument. But, we have explicitly held that "no plain error doctrine exists [in civil cases] to remedy errors which are alleged to have occurred during closing argument."[4] *Deppe,* 863 F.2d at 1364.

---

**3.** In the criminal context, federal appellate courts apply the "plain error doctrine" to review district court errors that have been waived by a defendant's failure to make a contemporaneous objection at trial. An error is "plain," in criminal cases, only where it results in " 'an actual miscarriage of justice,' which implies that the defendant 'probably would not have been convicted but for the erroneously admitted evi-

dence.' " *United States v. Nolan,* 910 F.2d 1553, 1562 (7th Cir.1990), *cert. denied,* 499 U.S. 942, 111 S.Ct. 1402, 113 L.Ed.2d 457 (1991) (quoting *United States v. Mejia,* 909 F.2d 242, 247 (7th Cir.1990)).

**4.** Kafka similarly argues that, during closing argument, Sneckenberg "made a number of appeals to the jury, not based on relevant evidence,

■ Kafka also asks us to apply the "plain error doctrine" because he claims the district court allowed Sneckenberg to "testify" during his cross-examination of witnesses. Again, in *Deppe*, we opined that the "plain error doctrine" might conceivably be applicable in civil cases only in the narrowest way to "review evidentiary rulings to which no objection was made at trial *if* a moving party can demonstrate (1) that exceptional circumstances exist, (2) that substantial rights are affected, and (3) that a miscarriage of justice will result if the doctrine is not applied." *Id.* at 1362.

Kafka does not direct us to any exceptional circumstances which caused his failure to object to the questions propounded to him during cross-examination. Nor does he say why a miscarriage of justice will result if we do not apply the plain error doctrine. Thus, we will not review, even for plain error, Sneckenberg's cross-examination questions.

### Attorney Disqualification

Next, Kafka argues that Sneckenberg should have been disqualified from acting as TIE's trial attorney. Kafka's brief, however, does not make it entirely clear *why* Sneckenberg should have been disqualified. Kafka appears to argue that Sneckenberg knew or should have known that he might be called as a witness for either Kafka or TIE,[5] when Jaske testified that Sneckenberg and not Jaske decided what information was material to the claim investigation.

■ The district court found that Kafka waived the disqualification argument by failing to file a motion requesting Sneckenberg's

disqualification. We agree. "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Central Milk Producers Coop. v. Sentry Food Stores*, 573 F.2d 988, 992 (8th Cir.1978). Here, Kafka should have sought Sneckenberg's disqualification after Jaske's testimony. But he did not ask for disqualification at any point during the trial. Thus, he has waived this argument. Furthermore, as noted earlier, the plain error doctrine is of no avail in this context.

### Motion in Limine

The district court granted a motion in limine prohibiting TIE from introducing evidence concerning certain misrepresentations Kafka made in his insurance policy application. The district court's order was based on an Illinois statute which prohibits an insurance company from denying coverage based on an insured's misrepresentations in a policy application unless a copy of the application is "attached to or endorsed on the policy, and made a part thereof." *See* Ill.Ann.Stat. Ch. 215, Para. 5/154 (Smith–Hurd 1993). TIE did not attach a copy of Kafka's application to the policy. Thus, the district court prohibited TIE from introducing evidence of Kafka's misrepresentations in the application process because those misrepresentations did not relieve TIE of its duty to provide coverage.

Kafka contends that Sneckenberg, during opening statement,[6] cross-examination of witnesses, and closing argument, repeatedly violated the order in limine by raising the infer-

---

but designed to inflame them and appeal to their passions." However, Kafka did not object to what he now alleges were inflammatory statements. He has thus waived this argument and we will not apply a "plain error" analysis.

5. Rule 3.7(a) of the Illinois Rules of Professional Conduct provides that "[a] lawyer shall not accept or continue employment in contemplated or pending litigation if the lawyer knows or reasonably should know that the lawyer may be called as a witness on behalf of the client except" in a few specified situations not relevant here. Rule 3.7(b) provides that "[if] a lawyer knows or reasonably should know that the lawyer may be called as a witness other than on behalf of the client, the lawyer may accept or continue the

representation until the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client."

6. During his opening statement, Sneckenberg told the jury: "The evidence will show that he [Kafka] approached Farmers Insurance Agent, Ted Palonczyk, who you will see in this courtroom. He told him that he was going to take this Club Algiers and use it for offices and a studio. The evidence will show that Mr. Kafka never had an intention to do that at any time whatsoever." Kafka now argues that this statement violated the order in limine. But he failed to object to the statement at trial. Thus, this argument has been waived.

ence that Kafka was provided with insurance coverage only because he lied on his application. However, after carefully reviewing each of the instances Kafka claims violated the order in limine, we find either that no error occurred or that Kafka failed to preserve the alleged error for appellate review.

During cross-examination, the following exchange took place which Kafka contends violated the order in limine:

SNECKENBERG: Now, let me talk a little bit about the insurance on the premises. You spoke with Ted Palonczyk concerning insurance, did you not?

KAFKA: That's right.

SNECKENBERG: You told him, did you not, that you were going to use the building for offices and a studio, is that correct?

KAUFMAN: Your Honor, I think we need a sidebar.

THE COURT: Step over here.

(Out of the hearing of the jury)

KAUFMAN: During the summer your Honor gave an order and a motion in limine about when representations were made during the application process. I feel counsel is really crossing over that line right now. He is talking about representations made to the defendant before the policy was issued. That is what you ruled on, that we stay away from.

SNECKENBERG: I am not.

KAUFMAN: What did you just ask him?

SNECKENBERG: I asked him what was said. It has to do, specifically, with the increase of hazard and whether the property was vacant and what the insurance company knew or did not know.

KAUFMAN: These were representations during the application process.

THE COURT: Stay away from it. You read the order.

No error occurred in this exchange because the district court *sustained* Kafka's "objection." However, Kafka argues that Sneckenberg ignored the district court's admonishment to stay away from Kafka's misrepresentations in the application process during his direct examination of Dennis Graves, the insurance policy's underwriter:

SNECKENBERG: Can you tell me what was the risk that Farmers was insuring at 8039 West Ogden Avenue?

GRAVES: An office.

SNECKENBERG: How were you able to determine that?

GRAVES: There is a spot on the new business application that describes the business and "office" was written in that spot.

KAUFMAN: Your Honor, could we have a sidebar please?

THE COURT: Come on over here.

(Out of the hearing of the jury)

KAUFMAN: There was a ruling on the motion in limine with respect to dealing with the application. You previously ruled that you can't go into the application.

SNECKENBERG: I don't intend to.

THE COURT: Fine.

(Proceedings resumed within the presence of the jury)

THE COURT: You may proceed.

SNECKENBERG: Thank you, your Honor.

Question: Can you tell me what was the issuance date of the policy?

Here again, Kafka's "objection" was sustained and Graves did not answer the question which raised a concern. Thus, there was no error here either. Next, Kafka argues that Sneckenberg violated the Order during his recross examination of Graves:

SNECKENBERG: Was a vacant building a risk and a building that was subject to condemnation a risk that Truck Insurance Exchange accepted when they issued the policy in question here?

GRAVES: We would not accept one if we knew of it.

Kafka did not object to Sneckenberg's question nor did he make a motion to strike Graves' answer. Thus, he has waived this argument.

Finally, Kafka argues that Sneckenberg violated the order twice during closing argument. The first violation allegedly occurred when Sneckenberg stated that "[t]he insurance company insured an office building. That is what they insured. They got that

information from Mr. Kafka." Once again, however, Kafka failed to object to this portion of Sneckenberg's closing argument and cannot complain about it for the first time on appeal. Kafka further argues that Sneckenberg violated the order for a second time during closing argument when he stated that "[h]e (Kafka) said I was going rehab the existing structure for my own office. That's what he told the insurance company and that's why the policy was issued." Kafka made a general objection to this statement.

"An objection is proper only if 'a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.'" *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988) (quoting Fed. R.Evid. 103(a)(1)).[7] Because Kafka failed to make a specific objection at trial, he has failed to preserve this alleged error for appellate review. *United States v. Fulford*, 980 F.2d 1110, 1115 n. 2 (7th Cir.1992) (citing *United States v. Chaidez*, 919 F.2d 1193, 1202 (7th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991) and *cert. denied sub nom., Chavira v. United States,* — U.S. —, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991)).

*Refusal to Reopen Evidentiary Submission*

■ Kafka contends that the district court erred by refusing to reopen proofs after the close of all the evidence. During the trial, three witnesses testified concerning their efforts to contact Kafka at his home the morning of the fire.[8] Thomas Weitzel, a patrolman with the Riverside, Illinois Police Department, testified that he went to Kafka's residence shortly after 5:30 am and rang the door bell several times, banged on the front door with a flashlight, and knocked on the rear door. He testified that there was no response except that he heard a dog barking inside the residence. Weitzel subsequently told the police dispatcher to call Kafka's residence but was informed by the dispatcher that nobody answered the phone. Weitzel testified that shortly before he left, he heard the telephone inside the residence ringing.

Stephen Gonzales, a Riverside Police Dispatcher, testified that he placed two or three phone calls to Kafka's residence, letting the phone ring 15 or 20 times on each attempt, but there was no answer. Gonzales stated that he got Kafka's phone number from an index card file maintained by the Riverside Police Department. Each card contains the name, address, and phone number of the city's residents. Robert Sullivan, a Lyons Fireman, testified that he called his desk operator from the fire scene and told him to call the Riverside Police Department and ask them to notify Kafka about the fire. Sullivan further testified that after he returned to his office he obtained Kafka's phone number from the Riverside Police Department and placed a call to Kafka's residence at approximately noon the day of the fire. There was no answer. Both Kafka and his wife testified that they were at home when the fire occurred and only found out about it by watching the six o'clock news.

The witnesses' testimony was important for two reasons. First, it created the impression that Kafka was not at home the morning of the fire because he had been involved in setting the building fire. Second, it damaged his credibility because he testified that he was at home during the fire.

After the close of evidence, but before closing arguments, Kafka moved to reopen proofs for the purpose of introducing the Riverside Police Department's index file card which the witnesses used to obtain his home phone number. According to Kafka, the phone number on the card was not his resi-

---

7. Kafka does not argue on appeal that the specific ground was apparent from the context, thus he has waived this argument. *Wynn,* 845 F.2d at 1442, n. 6.

8. Information regarding the various attempts to contact Kafka was contained in a report compiled by Lyons Police Chief Robert Sullivan. The report was not provided to Kafka during discovery because, according to TIE's counsel, it be- came available only shortly before trial. Kafka argues that TIE's failure to turn over the report should have barred the witnesses' testimony. We agree with the district court that TIE's disclosure of the names of the witnesses during discovery provided Kafka with the opportunity to take their depositions and to ascertain the extent of their testimony. As such, he suffered no unfair prejudice by not having access to the report.

dential phone number. In denying Kafka's motion, the court stated:

> The Court finds that the tendered proof, certainly, was available. The whole issue doesn't come as a great surprise. Even if the Court opened, that would necessitate the defendant going back and attempting to determine records from the telephone company. After this passage of time and under these circumstances the Court does not feel that the information would be that helpful to the trier of fact.

Kafka acknowledges that the district court has wide discretion in deciding whether to allow a party to reopen proofs after the close of evidence. *See Rhyne v. United States,* 407 F.2d 657, 661 (7th Cir.1969); Michael H. Graham, *Handbook of Federal Evidence,* § 611.5 (3rd ed. 1991). However, Kafka contends that the court abused its discretion by refusing to reopen evidentiary submission to allow introduction of the index card.

We disagree. Even without introducing the index card into evidence, Kafka was able to counter the witnesses' testimony concerning the telephone calls made to his residence the morning of the fire. For instance, Gonzales, on cross-examination, acknowledged that it was possible that the index card contained Kafka's business or car phone number rather than his residential phone number. Moreover, the district court was correct in its assessment that reopening the evidence would cause undue delay. If the index card was admitted into evidence, TIE could have sought to obtain the appropriate telephone company records for submission into evidence. Also, Kafka knew that these witnesses were going to testify. He could have taken their depositions and discovered the relevance of the index card earlier, in time to have it timely admitted into evidence. Given these circumstances, we cannot say that the district court abused its discretion in denying Kafka's motion to reopen the evidence.

Finally, Kafka argues that "a sizable portion of the evidence offered by the defendant was either immaterial, irrelevant, improperly inflammatory or cumulative." Because this argument is entirely without merit, we will not address it.

## Conclusion

For all of the foregoing reasons the decision of the district court is AFFIRMED.