**Jackie WILSON, Plaintiff–Appellant,**

v.

**James K. WILLIAMS, Defendant–Appellee.**

No. 97–2637.

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 5, 1997.[1]

Decided Nov. 30, 1998.

1. This successive appeal has been submitted to the same panel under Operating Procedure 6(b). After an examination of the parties' briefs and the record, we have concluded that oral argument is unnecessary. Accordingly, the appellant's request for oral argument is denied and the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a); Cir. R. 34(f).

Steven H. Hoeft (submitted), Craig H. Zimmerman, McDermott, Will & Emery, Chicago, IL, for Plaintiff–Appellant.

Richard A. Devine (submitted), Michael D. Jacobs, David S. Meyerson, Office of the State's Attorney of Cook County, Chicago, IL, for Defendant–Appellee.

Before WOOD, JR., COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The inmate plaintiff, Jackie Wilson, filed this 42 U.S.C. § 1983 civil suit claiming that he was assaulted by a corrections officer, James Williams, while he was confined and awaiting trial on charges for murder and armed robbery of two Chicago police officers. Before this civil suit went to trial, Wilson was

convicted of the murder of one of the officers and acquitted of the other, and was found guilty of committing both armed robberies. Prior to the murder trial, Wilson filed a motion *in limine* to bar the reception of evidence of the murder victim's occupation and the motion was denied by the trial judge. During his opening statement, plaintiff Wilson's attorney told the jurors that they would hear evidence that his client had been convicted of murdering a police officer. Wilson, during cross-examination by defense counsel, admitted that he had been convicted of murdering a Chicago police officer, without objection from his attorney. Nor did Wilson's attorney object when one of Williams' witnesses, Corrections Officer Thomas Cavallone, testified that, shortly after the alleged altercation between Wilson and Williams, Wilson loudly boasted to several corrections officers that he had "killed two Chicago police officers." During his closing argument, Wilson's counsel emphasized the occupation of his client's murder victim, using the term "cop killer" no less than seven times. The jury found for the defendant Williams. On appeal,[2] Wilson claims that although it was proper for the jury to be advised that he had been convicted of murder, the court committed error in allowing the introduction of evidence that the victim was a police officer.

We hold that Wilson waived his objection to the introduction of evidence regarding his murder victim's occupation by failing to renew his motion *in limine* at trial and by failing to timely object when the disputed evidence was introduced. Furthermore, Wilson waived his objection by preemptively informing the jury of the very evidence that he wanted to exclude, and making repeated reference to such evidence, including using it for his own strategic purposes in his closing argument. Because Wilson waived his objection to this evidence, we affirm.

## I. BACKGROUND

On June 23, 1988, the plaintiff herein, Jackie Wilson ("Wilson"), was being held in pretrial detention in the Cook County (Illinois) Jail, awaiting trial for the murder and armed robbery of two Chicago police officers. The afternoon of the altercation, Wilson was in the "dayroom" watching television with a fellow inmate, Aryules Bivens ("Bivens"). Inmate Johnny Walker Red ("Red") was scheduled to return to the area from a court proceeding. On his way, Red would be passing through the dayroom to return to his cell. According to the testimony at trial, Red was not well liked as he was loud, obnoxious, and "aggravated people."

One of the corrections officers, Nona Cameron, testified that shortly before Red passed through the dayroom, Wilson told her that if Red had occasion to enter the room, "they [presumably meaning Wilson and Bivens] was going to kick his ass" because they were tired "of being disrupted all night long." This threat raised enough concern for Cameron to prompt her to ask her superior officer to send another corrections officer to escort Red to his cell.[3] James Williams, the defendant corrections officer, was assigned to escort Red. Although Williams knew the charges Bivens and Wilson were facing at the time, he was not personally acquainted with either one of them, nor did he have knowledge of any threats Wilson made against Red. Officer Williams was of the belief that this was nothing but a routine prisoner transfer, the kind he had engaged in hundreds of times before.

Williams escorted Red into the dayroom, and the security door was closed behind them at this time. Officer Williams testified that he then heard someone at his side yell, "Get the MFer." He turned and observed Wilson and Bivens running toward him and Red. Officer Williams explained that Bivens grabbed the front of his shirt, and at the same time Wilson, who had run behind Williams, struck Williams on the right side of his head. At that point, Red darted out of the dayroom and into the corridor. Bivens followed, slamming the heavy steel dayroom door shut. During this time frame, Wilson continued to assault Officer Williams. Williams reached for Wilson and struggled

---

**2.** This is the third appeal of this case; the previous two appeals are *Wilson v. Williams*, 997 F.2d 348 (7th Cir.1993) and *Wilson v. Williams*, 83 F.3d 870 (7th Cir.1996).

**3.** Apparently, Corrections Officer Cameron was obligated to remain at her designated post in the jail until she was relieved or reassigned.

with him, and the two fell to the floor, rolling and tussling around, exchanging punches. Williams called for help, whereupon Officer Cameron radioed for assistance. Several of the prison guards, hearing the "officer down" emergency radio call, responded to the scene and entered the dayroom to break up the altercation and assist Officer Williams. The first to arrive was Corrections Officer Long, who observed Williams on his back with Wilson straddling him and continuing to rain punches upon him. Officer Long, in assisting his fellow Officer Williams, pulled Wilson off of him. At this time, Williams rolled to the side and sat against the wall, exhausted and out of breath, as several corrections officers attempted to restrain Wilson.

At trial, inmate Wilson gave a different account of the events surrounding his altercation with Officer Williams. He stated that he and Bivens had been watching television when Red entered the dayroom, carrying some belongings, with Williams several steps behind him. Bivens, who testified that he wanted to "scare the hell out of" Red because he was a "stool pigeon," stepped between Red and Officer Williams. Red walked away from Bivens and walked past the gate leading to the corridor. Bivens followed, slamming the door closed behind him and leaving Wilson and Officer Williams locked in the dayroom alone. Wilson testified that Red looked "spooked" by the sound of the slamming door, and that he (Wilson) laughed at this, whereupon Officer Williams, unprovoked, threw him to the floor and assaulted him. Wilson stated that he asked Williams what his problem was, and received no response. He further testified that the two of them fought for several minutes before the other officers came to the scene and broke up the fight. According to Wilson, although he was now restrained, an enraged Officer Williams continued to assault him, kicking him several times in the head (prisoner Bivens testified that he saw Officer Williams and the other corrections officers kicking Wilson, and further testified that Wilson was kicked forty to fifty times). Wilson stated that thereafter, he was escorted from the tier and, while being escorted down some stairs, was pushed from behind by an unknown officer, lost his balance, and fell down the

stairs, further injuring himself. This charge was denied by the officers who escorted him. They testified that one officer preceded Wilson in the stairwell while another followed him, and that Wilson neither fell nor was pushed down the stairs. Wilson also alleges that after he was pushed down the stairs, he was taken to a "security post" where Officer Williams resumed beating him.

The parties agree that Wilson was taken from the security post to the jail's medical care facility, Cermak Health Services. One of his escorting officers, Thomas Cavallone, testified that Wilson, while on his way to the health center, was talking very loudly and stated, "I already killed two Chicago police officers." Wilson, on his first trip to the health center, refused medical treatment and the doctor noted on his report that Wilson was "hostile and angry." Wilson was returned to the cell block, but later requested medical treatment and was again escorted to the medical care facility. According to Officer Cavallone, during this second trip Wilson proclaimed, "[Y]ou should have killed me when you had the chance. I already killed two Chicago police officers. My attorney is going to have a field day with this. I have no respect for the law. And the next thing we are going to do is take care of the blue shirts inside the jail." [4]

Another corrections officer, Officer Long (the corrections officer who pulled Wilson off of Officer Williams), testified about a statement made by Wilson, this one occurring in the dayroom on July 28, 1988, that is, about a month after the altercation. Long explained at trial that Wilson kicked over a chair and at the same time hollered about his hatred for the Department of Corrections ("DOC") in general, and his hatred for Officer Williams in particular, for interfering with his assault on another inmate:

A: He was discussing how he hated, you know, DOC and, you know, Department of Corrections and everything, and everything it stood for and everybody in the department, you know.

Q: Did he make any statements specific to Officer James Williams?

4. The term "blue shirts" refers to prison guards.

A: Yes.

Q: What did he say specifically in relation to Officer James Williams?

A: Basically he said that he hated Officer Williams for stopping the attack on another inmate at the time, you know, like a month earlier, a month before that, you know, at the earlier time. And that if he ever got out that he would seek revenge against Officer Williams.

During his physical exam, Wilson claimed to the treating doctor that, during the altercation, he was kicked in the face several times and that he was hit in the head, back, groin, and rectum. The doctor testified, after the examination, that Wilson's injuries were inconsistent with the blows he alleges he suffered, and were instead "blunt trauma," consistent with a fist fight. Wilson had only two small lacerations on his head, slight swelling on the back of his head, and a bruise on his trapezius (the muscle on the upper back). Otherwise, Wilson had free mobility in his neck, his heart and lungs were normal, and furthermore, there was no evidence of trauma to his groin, penis, or rectum, and his neurological exam was normal. The absence of "more obvious bruising" led the doctor to conclude that Wilson had not been kicked numerous times. The doctor reasoned that when a person is kicked by an assailant wearing shoes, the resulting injuries would be much more extensive than what was displayed.

On May 3, 1989, Wilson was found guilty of the armed robbery and murder of one Chicago police officer, and of the armed robbery of a second Chicago police officer (the first officer's partner).[5] A little more than one year later, on July 9, 1990, Wilson filed this § 1983 action, alleging that Williams' assault on him constituted a violation of his due process rights under the Fourteenth Amendment.

The district court in that case granted Williams' motion for summary judgment, and ruled that because Wilson's examining physician had noted that his injuries were only "superficial" in nature, there was no chance that Wilson's account of the melee with Williams could be true. We reversed that decision on the grounds that genuine issues of material fact existed as to whether Wilson had initiated the fight with the officers, and remanded the case for trial. *See Wilson v. Williams*, 997 F.2d 348 (7th Cir.1993). At trial, the jury rendered a verdict for Williams, and Wilson appealed a second time and we reversed a second time, holding that the district court erred in giving a confusing "good faith" defense instruction. *See Wilson v. Williams*, 83 F.3d 870 (7th Cir.1996). The case was again remanded to the district court for a new trial and after trial is now before us on appeal for the third time.

At the time of the second trial, Wilson sought to exclude "all evidence of Wilson's criminal conviction for Murder, together with all reference to those criminal proceedings and ... any of the underlying conduct...." In responding to this motion *in limine*, Officer Williams argued that evidence of the murder conviction and the identity of the victim should be admitted because it reflected Wilson's overall antagonistic attitude toward authority and law enforcement. He also argued that it was admissible under Rule 609 of the Federal Rules of Evidence for its impeachment value. The trial judge ruled that the jury could hear evidence of the prior murder conviction, including the date, time, conviction and employment of the victim, but limited the introduction of this evidence for impeachment purposes only. The case proceeded to trial.

Immediately before counsels' opening statements, Wilson renewed his objection to the introduction of any evidence dealing with the fact that the murder victim was a Chicago police officer. The district judge again denied Wilson's motion. Wilson's counsel proceeded with his opening statement, arguing at one point:

You know because of yesterday's *voir dire* that Mr. Wilson was ultimately convicted for the crimes he was waiting to go to trial

---

5. Wilson was convicted of the armed robbery and murder of Chicago police Officer O'Brien, as well as the armed robbery of O'Brien's partner, Officer Fahey. Wilson was originally charged

with the murder of Fahey as well, but was not convicted of that crime. Wilson's brother, Andrew, was also convicted of the murder of O'Brien and Fahey.

on in 1988. He was convicted in 1989. And you will hear the evidence that he was convicted of killing a Chicago police officer.

As Wilson predicted in his opening statement, the jury indeed did hear evidence that Wilson had been convicted of killing a Chicago police officer. Under questioning by his own counsel, Wilson testified that he had been convicted of murder and armed robbery. Then, on cross-examination, Williams' counsel asked Wilson whether "the individual that you are convicted of murdering happened to be a Chicago police officer ... ?" Wilson responded in the affirmative. *It is important to note that at no time did Wilson's attorney object to this line of questioning.*

After the completion of testimony, the parties delivered their closing arguments. The defendant's counsel once again brought up his client's prior convictions and referred to him as a "cop killer" no less than seven times. Wilson's attorney stated, at various points in his closing argument:

> Now in opening statement the attorney for Mr. Williams used a lot of words that had nothing to do with this case but were meant to incite you, *cop killer*, inmate lotto, protecting the people, outnumbered. All those words were meant to inflame you, to tell you this man is a bad man; this man is a good man, so you must vote in his favor.

> When you were questioned on voir dire and these facts were brought up, you said you could be fair and impartial even if you found out that *my client was guilty of killing a Chicago police officer*.... And you said you could be fair and impartial, and I am going to hold you to that.

> Now one of the prospective jurors said it would be difficult to put that out of [his] mind. I don't want you to put that out of your mind. I want you to remember that Jackie [Wilson] is in prison for that, that this is where he spends the rest of his life, behind bars.

> But that doesn't mean he can be punished again and again at the whim of an officer. And it doesn't mean whenever he makes a charge that the answer is, well, *he is a cop killer*, he's an officer, you must believe the officer.

> ....

> [S]uddenly many other officers come up to the tier. What do these officers see? They know there is a problem going on with *a man they know to be accused as killing a cop*, and they don't know who started this fight, but they know he is involved and they come rushing in.... Suddenly they all lost control.... It doesn't take that many officers that much time to hold one man down, unless they are doing more than just holding him down. Unless they are taking a shot at him because they believe he is a bad person.

> ....

> They had in control what they said already was *a cop killer* who they thought had attacked an officer. I think they pushed him down the stairs. I think they hit him again. They had the opportunity. They had the motive.

> ....

> You heard about a hit, another word thrown in the opening. *Cop killer*, hit, inmate lotto. Nothing to do with the facts in this case. All meant to prey upon your emotion to convince you that my client, because of what he is, should never get anything no matter what happens to him.

> ....

> You have heard this is Red's fault for being obnoxious. You heard this is Bivens's fault for being an instigator. You have heard this is Williams's fault for not acting properly. *You have heard about a cop killer*. You have heard about inmate lotto.

(emphasis added). The jury returned a verdict for the defendant, Officer Williams, and Wilson appeals for the third time.

## II. ANALYSIS

### A. Standard of Review.

▮ In spite of the fact that the parties are in agreement that the district court's decision to deny Wilson's motion *in limine* to exclude evidence regarding the occupations of his murder and armed robbery victims should be reviewed under the abuse of discretion standard, we disagree. Although, generally speaking, the abuse of discretion

standard is appropriate when reviewing evidentiary decisions of the trial courts, *see Wilson v. Groaning*, 25 F.3d 581, 585 (7th Cir.1994) ("Whether a district court commits reversible error in admitting or excluding evidence is determined by the abuse of discretion standard.") (citation omitted), a different standard applies if and when the appellant fails to make a timely and specific objection to the admission of the disputed evidence. In those situations, we review a trial court's evidentiary rulings for plain error. *See Stringel v. The Methodist Hosp. of Ind., Inc.*, 89 F.3d 415, 421 (7th Cir.1996) (holding that, although typically our Circuit does not recognize plain errors in civil cases, "[t]he plain error doctrine may be available to review evidentiary rulings to which no objection was made at trial ....") (citing *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir.1988)); *see also Kafka v. Truck Ins. Exchange*, 19 F.3d 383, 386 (7th Cir.1994). This is one of those situations.

Wilson, on appeal, has waived his argument that the judge committed error in denying his motion *in limine* by failing to renew the motion during the trial including those instances when Williams offered in evidence Wilson's testimony that he was convicted of murdering a police officer and by failing to timely object during trial when the disputed evidence was introduced. In addition, Wilson's counsel contributed to the waiver problem by preemptively informing the jury in his opening statement that his client's murder victim was a police officer, and thereafter by repeatedly referring to and using the cop killer reference for his own strategic purposes during the trial and at the time of the closing argument.

**B. Wilson Has Waived His Argument that the District Court's *In Limine* Ruling was Erroneous.**

1. Wilson's failure to object when Williams elicited testimony that Wilson murdered a Chicago police officer.

■ In *United States v. York*, 933 F.2d 1343 (7th Cir.1991), *cert. denied*, 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991), we held that the *in limine* motion must be renewed at trial or the objection is waived: " '[A] party whose motion *in limine* has been overruled *must* object when the error the

party sought to prevent is about to occur at trial.' " *Id.* at 1360 (emphasis added) (quoting *United States v. Roenigk*, 810 F.2d 809, 815 (8th Cir.1987)). On the other hand, in *Favala v. Cumberland Eng'g Co.*, 17 F.3d 987 (7th Cir.1994), a panel of this court opined just the opposite, that " 'an unsuccessful motion in limine does preserve the issue for appeal....' " *Id.* at 991 (quoting *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1200 (7th Cir.1992)) (citing cases); *see Stutzman v. CRST, Inc.*, 997 F.2d 291, 298 (7th Cir. 1993); *Cook v. Hoppin*, 783 F.2d 684, 691 n. 2 (7th Cir.1986).

We are convinced that *York* is the better rule of law. Apparently we are not alone, as the rule in *York* has been followed by six other circuits. *See, e.g., United States v. Joost*, 133 F.3d 125, 129 (1st Cir.1998) ("Merely making an unsuccessful motion *in limine* to exclude evidence is insufficient to preserve a claim of error; the protesting party ordinarily must revivify his opposition at the time the evidence is offered.") (citation omitted); *United States v. Birbal*, 62 F.3d 456, 465 (2d Cir.1995), *cert. denied*, ――― U.S. ―――, 118 S.Ct. 433, 139 L.Ed.2d 333 (1997) ("When the district court denied [the defendant's] *in limine* motion to exclude all evidence of [the death of an individual to whom he sold heroin], it did not thereby relieve ... counsel of the obligation to object whenever specific inflammatory statements were made at trial."); *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1544 (10th Cir.1991) ("A party whose motion *in limine* has been overruled must nevertheless object when the error he sought to prevent by his motion occurs at trial."); *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1504 (11th Cir.1985) ("[A] party whose motion *in limine* has been overruled must object when the error he sought to prevent with his motion is about to occur at trial.") (quoting *Collins, infra*); *Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1333 (8th Cir. 1985) ("A motion *in limine* does not preserve error for appellate review. A party whose motion *in limine* has been overruled must object when the error the party sought to prevent with the motion is about to occur at trial.") (citations omitted); *Collins v. Wayne Corp.*, 621 F.2d 777, 785 (5th Cir.

1980) ("[A]n objection is required to preserve error in the admission of testimony or the allowance of cross-examination even when a party has unsuccessfully moved *in limine* to suppress that testimony or cross-examination."). In fact, the *York* rule exemplifies the majority view of courts in general. *See* Jack B. Weinstein, *Weinstein's Federal Evidence* § 103.11[2][b] at 103–16 (1997 ed.) ("*If a party has raised an objection before trial by means of a motion in limine that the court has denied, most courts hold that the objection must be renewed at trial for the objection to be preserved for appeal.*") (emphasis added); Michael H. Graham, *Handbook of Federal Evidence* (4th ed.1996) Vol. I, § 103.8 at 50 ("*To preserve error for appeal, counsel most often will be required to and thus to be safe should either renew the objection or make an offer of proof at trial.*") (emphasis added).

The dissent, in rejecting our support for the rule in *York*, which requires a party to restate his *in limine* objection prior to the introduction of the evidence at trial, disagrees with and states that *York* creates an "inflexible and unrealistic rule of trial practice." The dissent provides no reasoning for this claim; it is without any support whatsoever. The requirement that an attorney restate his *in limine* objection prior to the introduction of evidence at trial *is no more difficult for the trial lawyer than any other rule of procedure*. Furthermore, as the Supreme Court has made clear, *an in limine ruling is merely speculative in effect, completely dependent upon what happens at trial. See Luce v. United States*, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984).

The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of

sound judicial discretion, to alter a previous *in limine* ruling.

*Id.*, 469 U.S. at 41–42, 105 S.Ct. at 463.

*A motion* in limine *is a request for guidance by the court regarding an evidentiary question. The trial court may, within its discretion, provide such guidance by making a preliminary ruling with respect to admissibility. The parties may then consider the court's ruling when formulating their trial strategy. However, we see no reason why the trial court could not change its ruling, for whatever reason, when the evidence is actually offered and objected to at trial.... A ruling on a motion in limine is therefore essentially an advisory opinion by the trial court.*

*United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir.1983) (citations omitted) (emphasis added);[6] *see also, United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir.1994), *cert. denied*, 513 U.S. 1182, 115 S.Ct. 1172, 130 L.Ed.2d 1125 (1995) (*cited by Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir.1995)); *Moore v. General Motors Corp., Delco Remy Div.*, 684 F.Supp. 220, 220 (S.D.Ind.1988); *Sales v. State Farm Fire & Cas. Co.*, 632 F.Supp. 435, 436 (N.D.Ga.1986). For the court may very well and frequently does reconsider the denial of its prior *in limine* ruling if in fact other material evidence is received later in the trial and causes the trier of fact to reconsider his earlier ruling.

*Favala* misapprehends the nature of the *in limine* ruling and pretends that it has an existence and binding force apart from trial. "District Courts [would be] unlikely to continue to give advisory [*in limine*] rulings which increase the risk of retrial. The valuable benefit of *in limine* motions—a defendant's ability to prepare trial strategy with knowledge of the court's probable ruling on admissibility—would be lost." *Luce*, 713 F.2d at 1240.

When [as under *Favala*] a defendant's conviction can be reversed on the basis of

---

**6.** Not an advisory opinion in the sense that the court's ruling is unrelated to the immediate interests of the parties to the case (*that* type of advisory opinion is barred by Article III of the Constitution, *see, U.S. Nat'l Bank of Or. v. Indep.*

*Ins. Agents*, 508 U.S. 439, 446, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993)), but in the sense of advising the parties of what the court's ruling will probably be at trial.

an erroneous ruling on a motion *in limine*, the trial court's willingness to make a preliminary ruling will provide the defendant with an additional benefit—the chance for a new trial if the appellate court finds that the evidence was not properly admitted. Compare the situation where the trial judge declines to rule on a motion in limine with the situation where the motion is denied and the defendant does not testify. Assuming that it would be reversible error to admit the impeaching evidence, a defendant whose motion in limine was denied would have two chances for acquittal: the first trial, where he would not have testified; and the second, where he could testify without impeachment. A defendant would not have such an opportunity if the trial judge declined to make a ruling. Assuming again that the impeachment is improper, a defendant in this situation who testified and was impeached would also have two chances for an acquittal. However, he would not have the opportunity to present his case once without testifying and again with his testimony unimpeached.

*In addition to providing defendants with an unwarranted advantage, a trial judge's willingness to make a preliminary ruling, if such rulings were reviewable, would also enable defendants to challenge convictions that would have resulted even if the impeachment had been ruled inadmissible. This results from the reviewing court's inability to determine whether the defendant would have actually testified or whether that testimony would have resulted in an acquittal.*

*Id.* (emphasis added). Thus, the rule in *Favala* improperly gives all defendants a second bite at the apple. *York*, on the other hand, is more properly anchored on the firm foundation of a final ruling at trial, after the court has had the opportunity to hear the evidence. Therefore, regardless of what counsel might infer from the judge's wording when he or she makes an *in limine* ruling, that decision is only *preliminary*. *See Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1342 (9th Cir.1985) ("*In limine* rulings are by their very nature preliminary.").

 Granted, requiring an *in limine* objection to be renewed at trial does result in

the repetition of the objection, but this also has its benefits in that it gives the trial judge an opportunity to review his earlier ruling based upon the totality of the evidence received, and flags it for the attention of the appellate tribunal. Above all, "[c]ounsel has a duty to object, and even at the risk of incurring the displeasure of the trial court, to insist upon his objection." *United States v. Warner*, 855 F.2d 372, 374 (7th Cir.1988) (citation and internal quotations omitted). Besides, requiring that an attorney renew his motion *in limine* at trial is a small price to pay to preserve the proper functioning of our adversary system.

 During the trial, Wilson's attorney failed to renew his objection on two separate occasions. The first occurred during Wilson's cross-examination when, in response to questioning by Officer Williams' attorney, Wilson testified as follows:

Q: [T]he individual that you are convicted of murdering happened to be a Chicago police officer, is that correct?

A: Yes.

. . . .

Q: . . . And you have been continuously incarcerated on the charges of killing that police officer since basically February of 1982, is that correct, sir?

A: Yes.

Wilson's attorney failed to object on this occasion. The second time was during the examination of Officer Cavallone. Cavallone testified that Wilson, while being escorted for the first time to Cermak Medical Services, stated that he had killed two Chicago police officers:

He was talking very loud. He stated—he made one statement that myself and Officer Crosby and Sergeant Clay of Cermak Hospital was present for, he stated, I have already—I already killed two Chicago police officers, and—he was just talking out loud.

Again, there was no objection to Officer Cavallone's testimony, nor was there an objection to Cavallone's further testimony that Wilson made similar comments when he was returned to Cermak for the second time:

Q: Was there any incident with Wilson at Post 78 or elsewhere as you were escorting him back the second time?

A: While we were in the tunnel area going back to Cermak Hospital a second time, Inmate Wilson was talking out loud and made a couple of statements.

Q: What did he say?

A: He stated again, I—you should have killed me when you had the chance. I already killed two Chicago police officers. My attorney is going to have a field day with this. I have no respect for the law. And the next thing we are going to do is take care of the blue shirts inside the jail.

The dissent comments that Wilson's "second objection was raised during trial, just before opening statements." The dissent notes that "[h]ad counsel again interrupted the trial to make the same objection a third time, the judge would have been justified in asking plaintiff's counsel how many times was he going to have to deny plaintiff's motion before plaintiff got the message." We disagree with the dissent's comment referencing the plaintiff's counsel, for the clear and unambiguous language of our holding in the *Warner* case provides that an attorney has a **duty** to state an objection, and **"even at the risk of incurring the displeasure of the trial court, to insist upon his objection."** 855 F.2d at 374 (emphasis added). Further, the United States Supreme Court has held that a motion *in limine* is merely speculative in effect, and "a district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce*, 469 U.S. at 41–42, 105 S.Ct. 460.

In answer to the trial judge's possible reprimand the dissent alludes to, the plaintiff-appellant's counsel need *only have asked the trial court to grant leave to enter a "continuing objection" specific enough to reach the evidence in dispute for purposes of possible appeal. "A continuing objection serves … to obviate repeated objections to evidence admitted within the scope of the court's specific evidentiary ruling."* United States v. Gomez–Norena, 908 F.2d 497, 500 n. 2 (9th Cir.1990), *cert. denied*, 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990) (emphasis added). Furthermore, the dissent's comment on this point mischaracterizes this Court's holding in *York*, where we held that a motion *in limine* must be raised when "the error the party sought to prevent is about to occur at trial." The plaintiff's objection in this case was made prior even to the commencement of opening statements. Such an objection is hardly timely in light of our holding in *York*. Not only that, but plaintiff's counsel went on to raise the evidence in question himself during his opening statement.

The fact that Wilson failed to renew the motion and properly object when the evidence was received was just one factor that contributed to the waiver of his right to appeal the admission of this evidence. Let us consider the other factors.

2. The fact that Wilson preemptively informed the jury that the murder victim was a police officer and repeatedly referred to that circumstance during his closing argument also contributed to his waiver of his right to appeal.

Not only did Wilson waive his challenge to the district court's *in limine* ruling by failing to renew his motion and timely object when the disputed evidence was again elicited at trial, but also by preemptively informing the jury that his murder victim was a police officer as well as making repeated reference to that fact during closing arguments.

During the plaintiff Wilson's opening statement, his counsel stated to the jurors, "you will hear the evidence that he [Wilson] was convicted of killing a Chicago police officer." Thus, before Williams' counsel even had a chance to deliver his opening statement, Wilson took it upon himself to advise the jury of the very alleged objectionable information that he sought (*in limine*) to exclude, which is the very same information that he now claims irremediably infected his trial.

In *United States v. DePriest*, 6 F.3d 1201 (7th Cir.1993), we agreed with the Ninth Circuit that "a defendant waives his right to appeal a trial court's pretrial ruling that a prior conviction can be used by the prosecution for purposes of impeachment when the defendant himself brought out the fact of the prior conviction in his direct testimony." *Id.* at 1209 (citing *United States v. Williams*, 939

F.2d 721, 723 (9th Cir.1991)). Likewise, in *Gill v. Thomas*, 83 F.3d 537 (1st Cir.1996), the plaintiff filed a civil rights action and alleged that in the process of being arrested for driving with a revoked license, the police officer used excessive force to restrain him. After the trial judge denied the plaintiff's motion *in limine*, the plaintiff introduced evidence of several prior misdemeanors in an attempt to "remove the sting" from the arresting officer's anticipated impeachment testimony. *See id.* at 541. The plaintiff later appealed, contending that the prior misdemeanors should have been excluded from testimony. The First Circuit held:

> While [the plaintiff's attempt to "remove the sting"] may have been a wise tactical decision, as a consequence, [the plaintiff] "opened the door" to [the defendant's] cross-examination on the misdemeanors and thereby eliminated any potential evidentiary error. Moreover, *having offered the misdemeanors himself and having received the strategic benefit therefrom, [the plaintiff] cannot now be heard to complain that his own offer of such evidence was reversible error. . . .* To preserve his *in limine* objection to the admissibility of the misdemeanor convictions for this appeal, [the plaintiff] should have refrained from offering the evidence himself, waited to see if [the defendant] introduced them on cross-examination, and if so, objected then. In sum, [the plaintiff's] own action of offering the misdemeanor evidence himself rendered it admissible. *Or stated differently, by offering the misdemeanor evidence himself, [the plaintiff] waived his opportunity to object and thus did not preserve the issue for appeal.*

*Id.* (citations omitted) (emphasis added); *see also United States v. Smiley*, 997 F.2d 475, 480 (8th Cir.1993) ("*An objection to the admission of a prior conviction is not preserved for appeal when a defendant [the plaintiff-appellant Wilson in our case] introduces the evidence during his direct examination.*") (citation omitted) (emphasis added); *Coursen*, 764 F.2d at 1340 (*where trial court has previously ruled evidence admissible, the party [the plaintiff-appellant Wilson] who offers evidence herself to "take the sting" out waives objection to evidence*); *United States v. Bryan*, 534 F.2d 205, 206 (9th Cir.

1976) (*refusing to allow defendant [the plaintiff-appellant Wilson in our case] to complain about the admission of evidence about a prior conviction when defendant introduced the offending fact in the first instance*); *Shorter v. United States*, 412 F.2d 428, 431 (9th Cir.1969), *cert. denied*, 396 U.S. 970, 90 S.Ct. 454, 24 L.Ed.2d 436 (1969); *Nicholson v. Layton*, 747 F.2d 1225, 1227 (8th Cir.1984).

As we noted in *DePriest*, although a defendant's decision to preemptively insert evidence may impinge somewhat upon a party's ability "to ameliorate the anticipated effect of the prior conviction by bringing it out on direct examination, the defendant's decision deprive[s] the court and the prosecution of the opportunity to reconsider their stated positions on the issue." 6 F.3d at 1209 (citing *Williams*, 939 F.2d at 723); *see also Nicholson*, 747 F.2d at 1227 ("When the party introduces the prior conviction on direct examination, he denies the other party the ability to forego introducing such evidence and denies the district court the ability to review the probity of the prior conviction in light of the specific facts developed at trial.").

The dissent argues that the present case, wherein the defendant introduced the disputed testimony during his opening and closing statement, is distinguishable from our decision in *DePriest*, in which we held that the "defendant waives his right to appeal a trial court's pretrial ruling that a prior conviction can be used . . . for purposes of impeachment when the defendant himself brought out the fact of the prior conviction in his direct testimony." 6 F.3d at 1209. However, courts have previously held that in circumstances where parties to a suit "invite error" by referring to their prior crimes during opening statements, party opponents are free to later introduce evidence regarding those prior crimes. *See United States v. Segal*, 852 F.2d 1152, 1155 (9th Cir.1988). In *Segal*, *[d]efense counsel's opening statement included several explicit references to [the defendant's prior conviction for] use of cocaine. The government's opening statement included no reference to cocaine use or to cocaine purchases, by any party or witness. From defendant's*

*opening statement, the government could reasonably have anticipated further evidence of appellant's involvement with cocaine. On direct examination, the government stepped through the "open door" and inquired of [a government witness whether he had previously] ... bought cocaine from ... [the defendant].*

*Id.* (emphasis added). The *Segal* court went on to hold:

A ruling on the admissibility of evidence, absent a timely objection, will not result in a mistrial unless the alleged error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. *In view of defense counsel's opening statement ... we conclude that no unfairness or adverse reflection on judicial integrity results from affirming denial of appellant's motion for mistrial.*

*Id.* at 1156 (citation and internal quotation omitted) (emphasis added). Thus, it does not make any difference that the plaintiff Wilson introduced the evidence during his opening statement instead of during direct testimony because, in either event, Wilson "opened the door" as effectively as if he had introduced the evidence during direct examination. Wilson may not invite Williams to introduce the disputed evidence by "opening the door" and referring to it specifically during his opening statement, and then make an issue of the introduction of the disputed evidence by the defendant Williams during direct examination.

Wilson's comments on the fact that he murdered a Chicago police officer were not limited to his opening statement, however. He went on to make repeated reference to the evidence in question and, in fact, implored the jury to remember, during its deliberations, that he was in prison for killing a law enforcement official. It is not unusual that, if a party's motion *in limine* to exclude evidence is unsuccessful, the movant will attempt to minimize the impact of the contentious evidence at trial by referring to the damaging evidence before it is introduced by the opposing party. However, the movant cannot go overboard as he did in this case and certainly cannot stress to the jury *eight* times during opening and closing statements that it should *focus* on the very evidence

sought to be excluded. That is exactly what happened in this case.

At closing argument, Wilson's attorney again emphasized to the jurors that they should *"remember"* the very evidence that Wilson now claims should have been excluded:

When you were questioned on voir dire and these facts were brought up, you said you could be fair and impartial even if you found out that my client was guilty of killing a Chicago police officer.... And you said you could be fair and impartial, and I am going to hold you to that. Now one of the prospective jurors said it would be difficult to put that out of [his] mind. I don't want you to put that out of your mind. I want you to remember that Jackie [Wilson] is in prison for that, that this is where he spends the rest of his life, behind bars.

(emphasis added). Wilson's attorney repeatedly called his client a "cop killer" (or, alternatively, that he "killed a cop"), and on one occasion appeared to be arguing that Wilson's status as a "cop killer" was a precipitating factor in his being beaten:

[S]uddenly many other officers come up to the tier. What do these officers see? They know there is a problem going on with a man they know to be accused as killing a cop, and they don't know who started this fight, but they know he is involved and they come rushing in.... Suddenly they all lost control.... It doesn't take that many officers that much time to hold one man down, unless they are doing more than just holding him down. Unless they are taking a shot at him because they believe he is a bad person.

. . . .

They had in control what they said already was a cop killer who they thought had attacked an officer. I think they pushed him down the stairs. I think they hit him again. They had the opportunity. They had the motive.

Wilson's attorney was using Wilson's status as a "cop killer" for his own strategic purposes, in an effort to convince the jury to find for his client. This tack also has impli-

cations on the question of whether Wilson himself "invited error" and we explore those implications below. It also bears upon the question of waiver. *By repeatedly making reference to Wilson's murder of a police officer, Wilson's attorney voluntarily made the occupation of the murder victim an integral part of his case and, in turn, as under Gill, reinforced the waiver which he already created when he introduced the evidence during opening statement.* Wilson cannot now argue that the same evidence, which he referred to on eight different occasions and used as a foundation for his case, undermined the fairness of his trial. Had Wilson wished to preserve his *in limine* objection "to the admissibility of the [prior] conviction[ ] for this appeal, [he] should have refrained from offering the evidence himself, waited to see if [Williams] introduced [it] . . ., and if so, objected then. In sum, [Wilson's] own action of offering the . . . evidence himself rendered it admissible." *Gill*, 83 F.3d at 541.

**C. Applying the Plain Error Standard, the Trial Court Did Not Err in Admitting Evidence Regarding Wilson's Prior Victims.**

■ Because Wilson waived his objection to the admission of the disputed evidence on numerous occasions during the trial, our review is for plain error. It is obvious from the record that Wilson does not meet the stringent "plain error" standard, which is applicable in civil cases "only in the narrowest way. . . ." *Kafka v. Truck Ins. Exchange*, 19 F.3d 383, 386 (7th Cir.1994). A reversal based on plain error is permissible only when three elements are met: there must exist exceptional circumstances; substantial rights must be affected; and a miscarriage of justice will result if the doctrine is not applied. *See Stringel*, 89 F.3d at 421. In this case, there has been no demonstration of any extraordinary circumstances. Nor does the plaintiff inmate Wilson meet

the third criterion, i.e., that the evidence clearly caused a miscarriage of justice.[7] In fact, in granting Williams' summary judgment motion in Wilson's initial suit, the district court ruled that because Wilson's examining physician had noted that his injuries were only "superficial" in nature, there was no chance that Wilson's account of the melee with Williams could be true. As discussed in greater detail in the section on harmless error, the evidence in favor of the defendant in this case, even *without* the disputed evidence, strongly supports the jury verdict rendered in favor of Williams, the defendant. Therefore, the inclusion of the evidence of Wilson's prior victim's occupation clearly did not cause a miscarriage of justice.

■ It is also worth noting that for impeachment purposes, under the law of this Circuit, a party-witness' examination may include "whether the [witness] had previously been convicted of a felony, . . . what that felony was and . . . when the conviction was obtained," *United States v. Robinson*, 8 F.3d 398, 409 (7th Cir.1993), and in at least eighteen other states, as well as the District of Columbia, "murder of a police officer," or assault and/or battery of a police officer, *is* the name of the felony that may be part of the witness' examination. *See, e.g.*, D.C.Code Ann. § 22–2406 ("Murder of law enforcement officer"); Colo.Rev.Stat. § 18–3–107 ("First degree murder of a peace officer or firefighter"); Cal.Penal Code § 190.26 ("Peace officers as victims of second degree murder; life imprisonment without parole; special circumstances").[8] Thus, in each of these jurisdictions, the very fact that the title and identification of the witness' conviction is permitted into evidence alerts the jury that the prior crime involved a police officer.

**D. Admission of the Disputed Evidence Was Harmless.**

■ Lastly, even if one were to assume that there was no waiver and our review fell

---

7. A "miscarriage of justice" is a "[d]ecision or outcome of [a] legal proceeding that is prejudicial or inconsistent with substantial rights of [a] party." *Black's Law Dictionary* at 999 (6th ed.1990).

8. Sixteen other states—Connecticut, Hawaii, Iowa, Kansas, Louisiana, New Mexico, Nebraska, New York, Maine, Missouri, Montana, Okla-

homa, Rhode Island, Utah, Vermont, and West Virginia—have taken care to enact separate statutes that criminalize any battery and/or assault committed upon a law enforcement official and, once again, have title headings which specifically refer to the victim of the battery and/or assault as a police officer, and thus would be mentioned at the reading of the indictment or information at trial.

subject to the abuse of discretion standard, *see United States v. Saulter,* 60 F.3d 270, 275 (7th Cir.1995) ("We review evidentiary rulings for abuse of discretion.") (citation omitted), reversal would still not be proper, as the error, if any, in admitting evidence regarding the occupation of Wilson's murder victim is harmless. *See id.* ("Even if we find error, we will not reverse if that error was harmless.") (citations omitted); *United States v. Farmer,* 924 F.2d 647, 654 (7th Cir.1991) ("[E]ven erroneous evidentiary rulings will not be overturned if any resulting error was harmless.").

> [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. *As we have repeatedly stated, the Constitution entitles a criminal defendant to a fair trial, not a perfect one.*

*Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (citation and internal quotation omitted) (emphasis added).

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new

trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the *proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.*

Fed.R.Civ.P. 61 (emphasis added). As *Robinson* demonstrates, a litigant can receive a "fair trial" even when improper details regarding the identity of a defendant-witness' prior crime victim are introduced at trial.[9] In that case, after deciding that it was impermissible to elicit the name and residence of the defendant's attempted murder victim for impeachment purposes, "we conclude[d] that *the prejudice resulting from the prosecutor's conduct was harmless and did not operate to deprive Robinson [the defendant] of a fair trial.*" *Robinson,* 8 F.3d at 411 (emphasis added). We cited four factors which mitigated whatever harm might have resulted from the elicitation of the information:

> The evidence of Robinson's guilt was simply overwhelming. [2] Not only were two limiting instructions given, but the district judge told the jury to disregard the improper questions and answers and had them stricken.
>
> In addition, [3] the prosecutor never again mentioned Robinson's prior conviction after successfully pursuing the improper questioning .... Finally, we note that [4] the improper material takes up approximately three pages in a trial transcript which exceeds 2,400 pages.

9. Although *Robinson* was our only decision to consider whether the identification of a defendant's prior victim could be properly admitted under Rule 609, very recently, in *United States v. Fawley,* 137 F.3d 458 (7th Cir.1998), this Court addressed an analogous issue of whether it was error for the Government, on cross-examination of a witness in the defendant's perjury trial, to elicit the names of illegal aliens harbored by that witness. The defendant, Fawley, was charged with perjury, in violation of 18 U.S.C. § 1623, for having lied during an earlier grand jury proceeding against his employer, Klehm. Klehm had been indicted on multiple counts of harboring illegal aliens. At Fawley's trial, Klehm was questioned on direct by the defendant's attorney as to whether he, Klehm, had ever been convicted of a felony. Klehm responded that he had. On cross-examination, the Government sought to "amplify" the perfunctory nature of the question asked on direct examination and elicited testimony as to the names of the illegal aliens. Fawley was eventually convicted and appealed. The defendant cited to *Robinson* and argued that "eliciting the names of the aliens, ... the Government was allowed to unfairly delve into the details of Klehm's earlier conviction." *Fawley,* 137 F.3d at 472. We noted that the cross-examination might have been improper, but went on to conclude that "the prejudice resulting from the prosecutor's questioning of Klehm was harmless," likening Fawley's circumstance to that in *Robinson,* in which we held that any prejudice that might evolve from the prosecutor's improper questioning of the defendant regarding his prior conviction was harmless. *Id.* at 474.

**1092**

*Id.* (internal citations omitted); *see also Campbell v. Greer,* 831 F.2d 700, 708 (7th Cir.1987) (holding that even though there was no reason for defense counsel to ask the plaintiff in § 1983 action where the rape for which plaintiff was previously convicted occurred or to refer to the plaintiff as a "convicted rapist" during opening statements, "we do not believe ... these excesses standing by themselves warrant a new trial."); *Gora v. Costa,* 971 F.2d 1325, 1332 (7th Cir. 1992) (notwithstanding the fact that the defendant's incarceration was not admissible for impeachment purposes, reference to such incarceration "did not rise to the level of reversible error.").

Although no two cases are alike and although some factors may have been present in *Robinson* which are not present in Wilson's case (and vice versa), after examining and weighing and comparing the factors raised in *Robinson* to the evidence in this case and the court's ruling, we conclude that any error in admitting the evidence in question was harmless. First, the evidence which Wilson adduced at trial in an attempt to establish his § 1983 claim was both inconsistent and weak when compared to those facts supporting Officer Williams' defense. For example, Wilson claimed that he was kicked in the head several times, while his inmate witness testified that he (Wilson) was kicked forty or fifty times. Obviously these statements are at best inconsistent with each other. Both statements are inconsistent with the testimony of the doctor who examined Wilson, a neutral party in this dispute, who opined that "being kicked ... would involve more extensive injuries than what [was] present," and that if Wilson were kicked numerous times, "there would be ... more obvious bruising." The doctor also testified that, although Wilson had complained of being struck "over the head, back, groin and rectum," his injuries were superficial in nature and were not consistent with such a claim:

A: I examined his groin, penis and rectum, and I noted, and I am quoting here, that there were no bruises or evidence of trauma. The—

Q: Based on your experience as a doctor would you expect that there would be some if he made a complaint such as being struck in those areas?

A: If he had received a significant blow or trauma to those areas, one would expect to see some evidence of traumatic degree.

Additionally, Wilson changed his story several times about how his altercation with Officer Williams took place. He alleged in his complaint that, when he was in the dayroom, he noticed two inmates fighting in the corridor, and only after he began watching that fight did he become aware of Officer Williams, who was standing "right behind [him]." During trial this story changed. Wilson testified that he never saw any inmate fight in the corridor, and that his altercation with Officer Williams commenced when Bivens slammed the gate, Red looked "spooked," and Wilson laughed at Red's expression. In fact, when asked on cross-examination whether "[w]hat we're left with here is several different versions of how this incident began. Is that correct, sir?", Wilson answered, "Yeah."

The corroborating testimony offered by Wilson's fellow inmate Bivens does not fare much better. Bivens claims that Wilson was kicked as many as forty or fifty times, again a claim that is contradicted by independent medical evidence. Bivens also changed his story about how well he could see the fight between Officer Williams and Wilson. In the first of Wilson's § 1983 trials, inmate Bivens testified that he had not been able to see how the fight started because he was on the other side of the gate and was facing Red. By contrast, in the second trial (i.e., the trial whose judgment Wilson is now appealing), Bivens testified that he saw Officer Williams start the fight. Additionally, whereas Wilson testified that Officer Williams was behind him when Bivens slammed the corridor gate, Bivens submitted an affidavit which stated, in part, "After I shut the door, Mr. Wilson was several feet behind Officer Williams."

On the other hand, the evidence which Williams adduced at trial to support his defense was stronger than Wilson's evidence. For example, after the altercation, Williams was examined by a physician who testified that his injuries were best described as "blunt trauma" and were thus consistent with

Williams' characterization of the incident. It is also interesting to note that Wilson told one of the corrections officers that he intended to "kick [Red's] ass," certainly demonstrating that he was thinking about inciting violence when Red arrived, which in turn tends to support and affirm Williams' recitation.[10] Finally, Officer Cavallone testified that on the way to Cermak Hospital, Wilson boasted about having "already killed two Chicago police officers" and that "the next thing we are going to do is take care of the blue shirts inside the jail." And Officer Long testified that, a month after the incident, Wilson, in a display of his volatility, threw a chair and stated that he hated Officer Williams because he stopped his assault on another inmate a month earlier.

In addition, there are other *Robinson* factors which lead to the conclusion that the evidence in dispute was harmless. For instance, in *Robinson*, we were influenced by the fact that the disputed evidence took up very little time in a comprehensive trial, observing that "the improper material takes up approximately three pages in a trial transcript which exceeds 2,400 pages." 8 F.3d at 411. Similarly, the defense counsel's reference to the disputed evidence in the case at hand totaled approximately one page out of 750.

In addressing the possible error of introducing evidence of Wilson's murder victim, the dissent makes the unsupported assertion that none "of the cases cited by the majority involve anything so prejudicial as the 'cop killer' description." This contention, unsupported in the dissent, flies in the face of the conclusions our sister circuits have reached in considering the error of introducing at trial the details of other defendants' grisly prior crimes. For example, in *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir. 1980), a firearms possession case, the Tenth Circuit held that a police officer's statement at trial that *the defendant had previously been convicted of murdering a town marshal did not require the trial court to grant a mistrial because the reference to the victim's identity as a marshal was harmless error in view of other ample evidence of the defendant's guilt.* Furthermore, in *Campbell*, 831 F.2d at 708, a civil rights action alleging cruel and unusual punishment by prison officials, this Court held that although the prosecution introduced during opening statements details of the defendant's prior rape conviction, such evidence, standing by itself, did not warrant a new trial. In the case under consideration, we wish to point out that, as in *Laymon*, the introduction of the evidence that Wilson had previously murdered a law enforcement officer was harmless error in light of the overwhelming evidence of the plaintiff's guilt.

The dissent likewise comments that "under Federal Rule of Evidence 403 even relevant evidence may be excluded if the trial judge determines that its probative value is 'substantially outweighed by the danger of unfair prejudice....' Similarly, FRE 609 permits impeachment by evidence of the conviction of a crime, but again the court is cautioned to weigh the evidence against its prejudicial effect." This is exactly what occurred in this case—in making his *in limine* ruling, the trial judge carefully considered the prejudicial effect of the introduction of the plaintiff's prior crime of killing a police officer, weighed this against the probative value of the evidence, and ultimately made the determination to allow the evidence into the trial. Although the dissent may not agree with the court's decision, it was made by an experienced, fair and competent trial judge. Even if the dissent may not have made the same decision, it does not rise to the level of prejudicial error.

The diligent safeguards taken by the district court in this case during *voir dire* were similar to those used to alleviate the same problem that arose in *Robinson*. In *Robinson*, the court issued limiting instructions which helped insure that the jury properly weigh the evidence; in the instant case the magistrate judge presided over a thorough *voir dire* proceeding. In fact, *it would be difficult to envision a more thorough and*

---

10. At trial Wilson denied making such a threat to Officer Cameron. However, perhaps surprisingly, *Wilson's own attorney*, in his closing argument, stressed the truthfulness of Officer Cameron ("Officer Cameron tells it like it is.") and agreed with Officer Cameron that Wilson indeed made the threat, merely dismissing the threat as "idle chatter" ("He wouldn't say, I'm going to kick his ass if he meant it.").

*prejudice-mitigating voir dire.* Just prior to calling the jury *venire* into court, the magistrate judge met with counsel to discuss the questions he proposed, as well as to express his principal objective of insuring a fair and impartial verdict, stating:

> The plaintiff also suggested, and I agree, that in view of the fact that this evidence [as to the identity of Wilson's prior victims] is coming in, that the jury also, the potential jurors, be queried as to whether they could render a fair and impartial verdict and consider the evidence in this case even if it is shown that the plaintiff has been convicted of murder of a Chicago police officer.
>
> \* \* \*
>
> *My interest is getting a jury that, to the extent possible, will render a fair verdict. It might not be a perfect trial, but that the defendant get a fair trial. And that's the interest of the Court at this time.*

(emphasis added). *The magistrate judge was nothing short of meticulous in addressing and questioning the venire to ensure a fair trial.* Initially, he spoke to the prospective jury members as a group, emphasizing the importance of fairness and impartiality in the exercise of their duty:

> What we will be striving for with our questions to you is to obtain for the litigants a jury of men and women who will do the best they can to be fair and impartial in reaching their decision. We seek a jury who is without any bias or sympathies towards one party or the other. If one feels that he or she cannot be an impartial juror, he or she should so indicate to the Court or to one of the attorneys at the time when the questions are posed to you.
>
> Now once you are sworn in it is your duty to honestly answer all the questions posed to you so that we can assure ourselves that we have a qualified jury who will render a fair and impartial the questions posed to you so that we can assure ourselves that we have a qualified jury who will render a fair and impartial decision in this case.

After being sworn, each and every potential juror was asked, among other questions, *"will you be able to impartially consider the evidence in this case and render a fair verdict based upon the evidence if it is shown that the plaintiff has been convicted of murder of a Chicago police officer."* (emphasis added). *Two jurors stated that their decisions might be influenced by such evidence, and they were immediately discharged from service.*

We believe it is imperative to set forth with particularity the *voir dire* conducted because "meticulous, thorough, clear and concise questioning of potential jurors about their ... beliefs and prejudices," *United States v. Hoffman*, 806 F.2d 703, 710 (7th Cir.1986), *cert. denied*, 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987), can reduce an otherwise possible reversible error to a harmless one. In *Hoffman*, the defendant, a follower of Reverend Sun Myung Moon, was convicted of threatening the President of the United States, allegedly out of his dissatisfaction over Reverend Moon's imprisonment for tax evasion. On appeal, he argued that "many Americans look askance on their fellow citizens who join such cult style Eastern religions," and therefore, "the evidence of his prior affiliation with Reverend Moon would likely cause a jury to treat a defendant it knew to be a Reverend Moon follower much more unfairly than it would a defendant whose religion was not known to the jury or whose religion was known to be a mainline one...." *Id.* (internal quotations omitted). This Court held that the meticulous manner in which the *voir dire* was conducted mitigated the deleterious effect of testimony that the defendant was affiliated with Reverend Moon. And the factors that we held to be curative in *Hoffman* are certainly present in the instant case. Specifically, the trial judge dismissed two jurors who expressed a potential bias or prejudice against Reverend Moon's Unification Church. *See id.* at 710 (emphasis added). Just as the *voir dire* in *Hoffman* helped insure a fair trial, so did the *voir dire* in the case before us.[11]

11. The prejudice against murderers may not be dissimilar to that experienced by some religious groups. As one notable commentator explained, "the disclosure of ... affiliation with some strange and unpopular sect, *will often in many communities be fraught with intense prejudice."* McCormick, *Evidence* § 48 (1954) (emphasis added); *see also* Wigmore, *Evidence* § 935 (Chadbourn Rev.1970). Congress, in enacting

Furthermore, "[t]he jury has a right under the law to hear that any witness ... has a felony record that is or can be considered to be impeaching." *United States v. Toney,* 27 F.3d 1245, 1253 (7th Cir.1994) (citation omitted). It is more probable than not that a jury, after having been advised that a witness was previously convicted of · murder, would regard the assailant in an unfavorable light. *See Campbell,* 831 F.2d at 707 (the predominant assumption underlying Fed.R.Evid. 609 is that convicted felons perjure themselves more frequently than law-abiding citizens). But since society is inclined to view every person who intentionally takes the life of an innocent human being as reprehensible, it is unlikely that the jury's disapproval of Wilson would have been elevated to any significant degree when it gained knowledge that his victim was a police officer. Sad as it may seem, police officers are all too frequently killed in the line of duty. In fact, from 1994 to 1996, the most recent year records are available, more than 200 police officers were feloniously killed in the United States. In light of the fact that the murder of police officers has sadly risen to the level of not an uncommon occurrence, it is unlikely that the jury's disapproval of Wilson was increased. This is particularly true since the jurors in this instance, during their *voir dire* questioning, assured the court that their decision would *not* be affected should they hear that the murder victim was a police officer (Wilson's attorney did not object to the *voir dire* questioning). And this is why the Tenth Circuit in *Laymon* held that it was "harmless error" for the jury to hear evidence that the defendant had previously been convicted of shooting a law enforcement official, a "town marshal." 621 F.2d at 1053.

When considering whether the evidence regarding Wilson's murder victim caused error, we should not forget that Wilson's own attorney escalated any potential error. As noted earlier, *it was Wilson's attorney who, during opening statements, initially made the jury aware that it "will hear evidence that he [Wilson] was convicted*

*of killing a Chicago police officer," even before counsel for Williams had an opportunity to address the jury* (emphasis added). *It was Wilson's attorney who first elicited testimony regarding Wilson's prior convictions for murder and armed robbery on direct examination.* Furthermore, it was Wilson's attorney who, during closing argument and at the very last minutes of the trial, referred to the occupation of the murder victim in an effort to convince the jury that it was more likely than not that Wilson was beaten because he was a "cop killer":

> I don't want you to put [Wilson's conviction for murdering a Chicago police officer] out of your mind. I want you to remember that Jackie [Wilson] is in prison for that, that this is where he spends the rest of his life, behind bars.
>
> . . . .
>
> [S]uddenly many other officers come up to the tier. What do these officers see? They know there is a problem going on with a man they know to be accused as killing a cop, and they don't know who started this fight, but they know he is involved and they come rushing in.... Suddenly they all lost control.... It doesn't take that many officers that much time to hold one man down, unless they are doing more than just holding him down. Unless they are taking a shot at him because they believe he is a bad person.
>
> . . . .
>
> They had in control what they said already was a cop killer who they thought had attacked an officer. I think they pushed him down the stairs. I think they hit him again. They had the opportunity. They had the motive.

"A party cannot ... blow 'hot and cold' during the course of litigation. When a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position." *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 460 (7th Cir. 1991) (citations and internal quotations omit-

the Federal Rules of Evidence, recognized as much and said nothing about law enforcement officials when it prohibited the use of "[e]vidence of the beliefs or opinions of a witness on matters of religion ... for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." Fed.R.Evid. 610.

ted). By introducing the evidence of his prior crime to the jury and by attempting to make his status as a "cop killer" a substantial part of the case (as noted above, we are not convinced that Wilson succeeded in his effort), Wilson cannot now argue that the evidence caused error.

Lastly, Wilson likewise did not object when Officer Cavallone testified that Wilson bragged about having killed two Chicago police officers (on appeal, Wilson does not appeal the admission of Officer Cavallone's testimony). The jury thus properly heard Wilson's boast that he had murdered Chicago police officers. It seems likely that the jury could have matched this boast with the testimony that it (properly) heard that Wilson had been convicted of murder. Although Wilson denied making the statement, it is obviously more probable that a jury would have believed Cavallone and not Wilson: the predominant assumption underlying Fed.R.Evid. 609 is that convicted felons perjure themselves more frequently than law-abiding citizens. *See Campbell*, 831 F.2d at 707. Thus, it seems likely that, even if the evidence regarding the convictions had not been admitted, the jury still would have been aware that Wilson's conviction for murder pertained to a Chicago police officer.

### III. CONCLUSION

Because during plaintiff-appellant Wilson's opening statement, the plaintiff introduced the jury to the fact that he had been convicted of murdering a police officer even before Williams made mention of it, and because Wilson failed to object at either of the two instances that the disputed evidence was elicited by the defendant-appellee's witnesses at trial, and because Wilson referenced the disputed evidence seven times in his closing argument so as to make it the focus of the closing argument, Wilson has waived his right to appeal the district court's *in limine* decision. We are also of the opinion that Wilson has failed to satisfy the plain error standard, and as such, he is precluded from

obtaining a reversal on the ground he advances. And even if Wilson had not waived his right to appeal and we assumed the district judge's *in limine* ruling was incorrect, such error is harmless and does not entitle Wilson to a new trial.

The decision of the district court is AFFIRMED.

HARLINGTON WOOD, JR., Circuit Judge, dissenting.

This is not a very sympathetic case in which to dissent since it might appear to be in behalf of a "convicted cop killer." If this were a matter of sympathy, I would not be dissenting. It is instead an objection to what I regard as an inflexible and unrealistic rule of trial practice being imposed on trial lawyers who may face similar difficult circumstances in the future.

Another reason making this dissent difficult is that the majority has support for its view that an unsuccessful motion in limine is insufficient to preserve an issue for appeal even though in this circuit this general issue has been uncertain. My view was partially set out in *Cook v. Hoppin*, 783 F.2d 684, 691 n. 2 (7th Cir.1986), which held that once the court determined, on a motion in limine, that certain evidence was admissible, the party seeking its exclusion was free to treat this ruling as the law of the case and could go so far as to seek admission of the evidence himself without waiving his earlier objection to its admission. *See also Favala v. Cumberland Engineering Co.*, 17 F.3d 987, 991 (7th Cir.1994); *Allison v. Ticor Title Ins.*, 979 F.2d 1187, 1200 (7th Cir.1992); *Gora v. Costa*, 971 F.2d 1325, 1329 (7th Cir. 1992); *Harris v. Davis*, 874 F.2d 461, 464 n. 5 (7th Cir.1989). Additionally, I do not believe any of the cases cited by the majority involve anything so prejudicial as the "cop killer" description. I view that description as totally unnecessary for impeachment purposes, the reason for which it was admitted. The fact that plaintiff had been convicted of murder should have been enough for impeachment purposes without going into the prejudicial details of the murder.[1] The "cop

---

1. This circuit has consistently held that when a prior conviction is introduced for impeachment purposes under Federal Rule of Evidence 609, the only information that is properly admissible is the date, the title of the offense, and the

disposition. *See, e.g., United States v. Fawley*, 137 F.3d 458, 473–74 (7th Cir.1998) (citing *United States v. Robinson*, 8 F.3d 398, 409 (7th Cir. 1993)); *Gora*, 971 F.2d at 1330; *Campbell v. Greer*, 831 F.2d 700, 707 (7th Cir.1987). It is

killer" evidence could only inflame the jury while adding nothing to the impeachment quality of the felony conviction.

For impeachment purposes, there is generally no error in allowing evidence that the witness is a convicted felon. However, under Federal Rule of Evidence 403, even relevant evidence may be excluded if the trial judge determines that its probative value is "substantially outweighed by the danger of unfair prejudice...." Similarly, FRE 609 permits impeachment by evidence of the conviction of a crime, but again the court is cautioned to weigh the evidence against its prejudicial effect. The problem arises where the nature of the crime is particularly offensive. I put "cop killer" evidence in that category. To describe the plaintiff's felony conviction to that extent unnecessarily risks substituting prejudice for legitimate impeachment.

This is a civil rights suit brought by the plaintiff inmate against a corrections officer in the institution where plaintiff was being held on his murder charge. Wilson alleged that the defendant attacked him without provocation. Even a "cop killer" is entitled to a fair trial, but he could not receive that when the trial court permitted more than the fact of conviction of murder to be used in describing plaintiff's conduct. The majority views the objection to the details of plaintiff's crime as having been waived by plaintiff's counsel's failure to make an objection at the time the challenged evidence was offered at trial and because plaintiff was the one who first brought the evidence to the jury's attention. In the circumstances of this case, however, I do not believe that this constitutes waiver. To regard it as a waiver when the trial judge had already ruled twice on plaintiff's objection encroaches on the legitimate tactical choices counsel should have available in those circumstances. That can be illustrated with an outline of what happened in this case.

The day after plaintiff's written motion in limine was denied, June 3, 1997, the trial began with jury selection. The following day, jury selection was completed. Just prior to opening arguments on June 4, plaintiff's

counsel renewed his motion to exclude the "cop killer" evidence already ruled on adversely by the trial judge just the day before trial began. It was again denied. Wilson's counsel then stated to the court that as a result of the court's continued adverse evidentiary ruling, "I'm going to need to address that issue in my opening." As I see it, counsel had no good choice except to mention it first to the jury in an effort to minimize the adverse impact of the "cop killer" evidence when it was admitted. Otherwise, the jury might reasonably think that that very adverse evidence was something plaintiff's counsel had been intending to hide. Plaintiff's counsel consequently raised the subject in his opening as he had advised the trial judge he would have to do, stating, "[Y]ou will hear evidence that [Wilson] was convicted of killing a Chicago police officer." That is a generally accepted trial tactic when plaintiff knows there is unavoidable adverse evidence ahead and is certainly not "overboard" or excessive for the purpose. In contrast, defendant's counsel exploited the revelation at the very beginning of his opening argument by stating:

> With all due respect to [opposing counsel], I believe he left a few things out. I'd like to reintroduce the litigant, Jackie Wilson, cop-killer, murdered a Chicago officer who was on duty, Officer O'Brien. He also robbed Officer O'Brien. He was convicted of that. He also robbed Officer O'Brien's partner, Officer Fahey. He was also convicted of that. And, yes, that is the crime he was waiting trial on back in 1988 in the Cook County Jail....

Wilson was the first witness to testify and was called immediately following opening arguments. On direct examination by his counsel, Wilson testified to his prior conviction, giving the date, title of the offense, and disposition. He did not introduce the identity evidence; this information was brought out by defense counsel on cross-examination. While the majority relies on *United States v. DePriest*, 6 F.3d 1201 (7th Cir.1993), for the proposition that "[a] defendant waives his right to appeal a trial court's pretrial ruling

error to elicit any further information or to delve into the details of the prior conviction. While error of this type is subject to a harmlessness

analysis, *Fawley*, 137 F.3d at 474, as discussed above, the error in the present case is extremely prejudicial and cannot be dismissed as harmless.

that a prior conviction can be used ... for purposes of impeachment when the defendant himself brought out the fact of the prior conviction in his direct testimony," *id.* at 1209 (citing *United States v. Williams,* 939 F.2d 721, 723 (9th Cir.1991)), the present case is distinguishable from *DePriest.* While Wilson testified to the fact of his conviction on direct, the identity evidence was brought out only on cross-examination by defense counsel. On appeal, Wilson challenges only the admission of this additional detail, he does not challenge the admissibility of the evidence which he brought out on direct.

Then defendant's counsel in his closing argument further exploited the "cop killer" information far beyond any legitimate impeachment needs as can be seen in the following portion of defense counsel's closing argument. The effort was made to show similarities between Wilson's murder conviction and the fracas for which he was suing the corrections officer:

> But let's start talking about the evidence in the case. We have a case, June 23, 1988. Mr. Wilson is in jail pending trial on a serious charge. He is charged with the murder of a police officer. My co-counsel ... brought that up. Called Mr. Wilson a cop killer. It is absolutely true. Mr. Wilson didn't deny it. You know what, we didn't bring that up to play to your passions, we brought that up to you for one simple reason, your right to know and your right to know who we're dealing with, somebody here who has committed a violent act against a person in authority, a figure, a man in uniform, much like Officer Williams was in uniform on June 23rd, 1988. This man dislikes authority. He'll commit violent acts given the chance any time.

That was not just an impeachment argument, but a blatant effort to make plaintiff out to be a bad man because of his prior conduct, that he would commit further violent crimes against those in authority whenever he got the chance. Therefore, it would follow that plaintiff should not prevail in his civil case against an officer. This prejudicial situation cannot be excused as merely harm-

less error. Even when a witness opens the door to slight amplification of his prior convictions, defense counsel is not allowed to "harp on the witness's crime, parade it lovingly before the jury in all its gruesome details, and thereby shift the focus of attention from the events at issue to the witness's conviction in a prior case." *Robinson,* 8 F.3d at 410 (citing *Campbell,* 831 F.2d at 707). In the present case, not only did defense counsel elicit the impermissible evidence from Wilson on cross-examination, he argued it to the jury in both his opening and closing statements in a way designed to arouse emotion. Additionally, while plaintiff's counsel addressed the identity evidence several times in his closing argument, this was a reasonable attempt to mitigate the damaging evidence which at that point had already been introduced at trial by the defendant. On June 5, the trial concluded after the objectionable evidence had been admitted.

The majority claims a second waiver occurred when plaintiff's counsel again did not object when the prejudicial evidence was actually offered at trial. That would have been the third time plaintiff's counsel had objected in a period of a few days and the second objection within a few hours. During that short trial there was nothing new that developed that could have been seen in any way as possibly changing the judge's mind. Nor would the judge's memory have to be very long to remember plaintiff's renewed motion in limine on which he had again affirmed his denial just a few hours before.[2]

*York* and the other cases cited by the majority hold that the ruling on the motion in limine alone is not sufficient on appeal to preserve the objection and that the same objection must be raised again during trial when the evidence is to be admitted. In this case, the second objection was raised during trial, just before opening statements. Wilson's testimony immediately followed opening statements. Had counsel again interrupted the trial to make the same objection a third time, the judge would have been justified in asking plaintiff's counsel how many times he was going to have to deny plaintiff's motion before plaintiff got the message. The need for plaintiff to renew the motion such a

---

2. Plaintiff renewed his motion in limine soon after proceedings began at 11:00 a.m. on June 4.

Wilson's testimony concluded at 1:40 p.m. that same day.

short time after its being denied should be viewed as a superfluous requirement and the failure to do so should not constitute waiver. To find waiver in these circumstances, in my judgment, raises artificial barriers to a reasonable and accepted trial practice, creating a trap without good reason. I would follow the majority of cases in this circuit which hold that an unsuccessful motion in limine is sufficient to preserve an issue for appeal without the need for a contemporaneous objection, particularly when, as in this case, it all happened within a couple of days and nothing had happened that might be a basis for the judge to possibly change his ruling. *See, e.g., Favala,* 17 F.3d at 991 (citations omitted); *Harris,* 874 F.2d at 464 n. 5.

I see no waiver, only prejudice. The error in admitting the identity evidence cannot be considered harmless when viewing the trial as a whole. The plaintiff had an adequate jury issue and, given the similarity between the incidents and the inflammatory nature of the evidence, its admission may have had a substantial effect on the jury's decision. It is not the fault of this court that the case has not heretofore been fairly tried. It should go back again to give this convicted "cop killer" a fair trial on his civil rights violation claim.

I must, therefore, respectfully dissent.